Marshall E. Livingston, J.
This is a motion by all defendants for summary judgment in a libel action.
On Sunday, December 3, 1972 Channel 21, Rochester, New York, televised an eight-minute film produced by the University of Illinois Medical Center critical of chiropractic. Following the show, a special committee of doctors of chiropractic was formed, all of whom were members of the New York State Chiropractic Association practicing in the Monroe or Seneca County areas. At the first meeting this special committee decided to contact Channel 21 and ask the station to present a second show.
The special committee met with the staff of the station, asked for and was granted time on February 28, 1973 to discuss the practice of chiropractic in New York State “ which would correct the gross misstatements broadcast the afternoon of December 3, 1972 ”.
The format of the show was that a panel of the plaintiff . chiropractors and a colleague discussed their profession generally arid invited listeners to call in questions to the station, which were then answered by the panel members under the moderation of Mr. Haley from Channel 21.
• Dr. Mulligan, a defendant, was then chairman of the Commuriity Relations Committee of the Monroe County Medical Society, another defendant. Dr. Mulligan saw the plaintiffs’ program on February 28. The next day he wrote a letter to the Times-Union (defendant Gannett Co., Inc.), which letter was published in its regular column of letters entitled “ As Readers See It ”. Before the letter was sent, Dr. Mulligan, discussed the matter with Mr. Irish, the executive director of the medical society, who was aware of the contents and approved Dr. Mulligan’s action as chairman of the committee.
The letter was published on March 12, 1973 by the Times-Union under its headline “ Dangerous Cult Given TV Time ”. The entire letter read as follows:
“ Channel 21 is a public service television station. On February 28, it did a disservice to the public by giving air time to four cultists who called themselves chiropractors. This promotion of quackery should be vehemently discouraged.
*402 “ Many studies have been made of chiropractic and all come up with the same conclusion — that it is a dangerous cult. In 1967 President Johnson’s National Commission on Health Manpower reported that ‘ Although chiropractic is not the only existing cult, it is the only one which still constitutes a significant hazard to the public. ’ In a 1970 Fact Sheet on Chiropractic, the AFL-CIO reported to Congress that ‘ care of patients should only be entrusted to those who have a sound scientific knowledge of disease and whose experience and competence render them capable of diagnosing and treating patients by utilizing all resources of modern medicine # * * Neither chiropractic theory nor the quality of chiropractic education equip chiropractors to do this * * * ’
“ Chiropractors have obtained licensure ■ in most states through their powerful lobby. The National Advisory Commission on Health Manpower finds that ‘ # * The statute should be repealed to remove the cult’s shield of legitimacy * * * It should be recognized that no matter how high they are set, no matter how strictly they are enforced, licensure standards cannot redeem the scientific invalidity of chiropractic.’
“ The American Medical Association has long been opposed to chiropractic as an unscientific form of treatment. Also on record as being in opposition are HEW, the American Hospital Association, the Association of Medical Colleges, the American Public Health Association, AFL-CIO, Consumer Federation of America, and many others. The National Council of Senior Citizens wrote in senior citizen news that ‘ Chiropractic treatment, designed to eliminate causes that do not exist while denying the existence of the real causes, is at best worthless — and at worst, mortally dangerous. ’
“ How can we improve the health care in America when we permit chiropractic to operate? ” (Matter italicized in letter was not published.)
Following publication, letters were sent May 15, 1973 to each of the defendants by plaintiffs’ attorneys, requesting a retraction of and an apology for Dr. Mulligan’s letter. No retractions or apologies were forthcoming, nor were the demands therefor acknowledged.
This lawsuit was thereafter commenced. Depositions of all parties were transcribed and handed up on argument. Prior to the depositions, interrogatories were answered under oath by the plaintiffs in which they stated they were without any evidence of actual malice, except that the defendants did not apologize for or retract the letter of Dr. Mulligan. However, *403 plaintiffs now assert, as a result of the depositions of Dr. Mulligan and Mr. Irish at the examination before trial recently held, that the record thereof contained evidence of actual malice toward these plaintiffs.
Defendant Mulligan’s remarks in his entire letter and his testimony upon the examination before trial are not of a malicious intent directed to these plaintiffs whom he concededly did not know. The letter sets forth an argument, allegedly false, directed against the practice of chiropractic by the medica;! profession and was not directed to the plaintiffs, nor does Dr. Mulligan’s testimony on the examination before trial, in my judgment, indicate actual malice against the plaintiffs.
This case turns on the effect of the recent holding in Gertz v. Robert Welch, Inc. (418 U. S. 323) decided June 25, 1974 by a majority of the United States Supreme Court (all references to page numbers allude to the opinion for the majority by Mr. Justice Powell and the concurring opinion by Mr. Justice Blackmttít, as prepared by the Reporter of Decisions, Supreme Court of the United States).
Some recitation of the facts of Gertz (supra) the intermediate court rulings and the posture in which Gertz came to the Supreme Court are required, I believe, to zero in on the principal holdings therein and their effect upon Rosenbloom v. Metromedia (403 U. S. 29) a 1971 case.
In 1968 a Chicago policeman named Nuccio shot and killed a youth named Nelson. He was tried and convicted for murder in the second degree. The Nelson family retained petitioner, Mr. Gertz, a reputable attorney, to represent them in civil litigation against the policeman. The respondent publishes a monthly magazine, which in 1968, among other things, claimed there was a nationwide conspiracy to discredit local law enforcement agencies and to create in their place a national police force capable of supporting a Communist dictatorship. An article appeared in respondent’s magazine which alleged that Nuccio’s trial was part of the conspiracy to discredit the local police. It falsely stated attorney Gertz had arranged Nuccio’s “ frame-up ”, implied that he had a criminal record and said he was a “ Communistrfronter ”. Included in the article was a photograph of the petitioner and under it the caption ‘ ‘ Elmer Gertz of the Red Guild harasses Nuccio ”. Respondents placed the magazine on sale throughout the country as well as distributing reprints of the article in Chicago.
Petitioner first filed his suit for libel in United States District Court, claiming the falsehoods injured his reputation as a *404 lawyer and a citizen. Before answer, respondent moved to dismiss on the ground that no special damages were alleged. The court held the statements were libel per se under Illinois law, and therefore, special damages need not be pleaded.
After answer, respondent moved for summary judgment, claiming a constitutional privilege against liability for defamation asserting petitioner was a “ public official (New York Times Co. v. Sullivan, 376 U. S. 254), or a “ public figure ” (Curtis Pub. Co. v. Butts, 388 U. S. 130) and that the article contained an issue of public interest and concern. District Court denied the motion.
At the trial, after the evidence was presented, the court ruled that Mr. Gertz was neither a “ public official ” nor a “ public figure ”. The court, in effect, then directed a verdict for the plaintiff only on the question of the measure of damages because some of the false statements in the article were libelous per se under Illinois law. The jury awarded $50,000 to plaintiff.
The court set aside the verdict on the ground that privilege protected discussion of any public issue without regard to the status of a person defamed therein. This ruling by the court in 1970 came before Rosenbloom v. Metromedia (403 U. S. 29, supra) was decided in 1971. The Court of Appeals affirmed and cited the Supreme Court’s then intervening decision in Rosenbloom {supra). It held that the standard of New York Times Co. v. Sullivan (376 U. S. 254, 280, supra) knowledge of the falsity of the published facts or reckless disregard for the truth, i.e., actual malice toward the person libeled, applied to any publication about an issue of public interest no matter who the person defamed was. The Court of Appeals ’ affirmance was based on its interpretation of the Rosenbloom {supra) plurality holding. This is the point where Gertz parts company with Rosenbloom.
In Gertz (p..332) Mr. Justice Powell succinctly states: “ The principal issue in this ease is whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements.”
From that take off point the opinion says (p. 333): 11 To place our holding in the proper context, we preface our discussion of this case with a review of the several Rosenbloom opinions and their antecedents.”
The court then reviewed New York Times Co. v. Sullivan (376 U. S. 254, supra), where the Times standard was applied *405 to “ public officials Next came an extension of the Times standard to “ public figures ” in Curtis Pub. Co. v. Butts (388 U. S. 130, supra). Then the court discussed the various opinions in Rosenbloóm (supra) noting that (p. 337): “under the plurality opinion, a private citizen involuntarily associated with a matter of general interest has no recourse for injury to his reputation unless he can satisfy the demanding requirements of the New York Times test (Emphasis supplied.)
The opinion then states (pp. 339-340): “ We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances Society’s interest in ‘ uninhibited, robust, and wide-open ’ debate on public issues. New York Times Co. v. Sullivan, 376 U. S., at 270. They belong to that category of utterances which ‘ are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.’ Chaplinsky v. New Hampshire, 315 U. S. 568, 572 (1942).”
Thus the court is saying that the exposition of ideas by opposing sides is the very essence of free debate and is constitutionally protected.
Defamation plaintiffs, according to the Gertz decision, are generally in three classes, two of whom are protected. Public officials and public figures comprise the generally protected classes. Private individuals being more vulnerable to injury have greater protection by the States respecting their rights for damages.
The court, significantly, it seems to me, explains the “ public figure” classification as follows (p. 351) : “Respondent’s characterization of petitioner as a public figure raises a different question. That designation may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure, for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular pubUc controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions ”. (Emphasis supplied.)
*406 The opinion discusses the definitive area reserved to the States (protection of damages to the individual) and the media’s shield afforded by the First Amendment. The court says (pp. 347-348): “We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or 'broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation. At least this conclusion obtains where, as here, the substance of the defamatory statement ‘ makes substantial danger to reputation apparent ’.”
It is not necessary to comment on the proof of damages required by Gertz {supra), for that matter has been resolved by my opinion.
Plaintiffs here find themselves in a situation where {Gertz, supra, p. 351): “An individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues * * * such persons assume special prominence in the resolution of public questions ”. .
Plaintiffs planned a course of conduct on a matter of public interest and concern, to wit, the continuing controversy between the medical and chiropractic professions, and used the forum on Channel 21 to answer the show of December 3, .1972.
I hold that these plaintiffs have brought themselves within the New York Times standard {supra). Dr. Mulligan’s letter was perhaps harsh, but in my judgment there was no ‘ ‘ actual malice ” demonstrated against plaintiffs. The letter did no more than espouse an opinion that chiropractors are a “ dangerous cult ”. It seems to me that the comment of Thomas Jefferson in his first inaugural address sums up the answer {Gertz, supra, p. 16, note 8): “If there be any among us who wish to dissolve this union or change its republican form of government, let them stand undisturbed as monuments of the safety with which error of opinion may be tolerated where reason is left free to combat it.”
Submit order, granting summary judgment to each defendant, without costs.