DAIRY STORES, INC., T/A KRAUSZER'S FOOD STORES, PLAIN-
TIFF-APPELLANT v. SENTINEL PUBLISHING CO., INC., PA-
TERSON CLINICAL LABORATORY, INC., AND KATHLEEN
DZIELAK, DEFENDANTS-RESPONDENTS.

Argued September 23, 1985—Decided October 21, 1986.

128

*Jay J. Rice* argued the cause for appellant (*Meth, Nagel, Rice, Woehling & Bausch,* and *Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein,* attorneys).

*Douglas G. Sanborn* argued the cause for respondents Sentinel Publishing Co., Inc., et al (*Jamieson, Moore, Peskin & Spicer,* attorneys).

*Norbert T. Knapp* argued the cause for respondent Paterson Clinical Laboratory, Inc. (*Catlett & Knapp,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal requires that we declare the standard of liability of a newspaper, its reporter, and an independent laboratory retained by them for statements that allegedly defamed the plaintiff corporation's reputation and disparaged its product. Relying on the first amendment to the United States Constitution, the Law Division granted summary judgment for the defendants, finding that they had not published the statements with reckless disregard for their truth. 191 *N.J.Super.* 202 (1983). The Appellate Division affirmed. 198 *N.J.Super.* 19 (1985). We granted certification, 101 *N.J.* 236 (1985), and now affirm the judgment of the Appellate Division. In reaching that result, we look to federal law for guidance, but we base our decision on the common-law privilege of fair comment.

–I–

During a drought in 1981, two weekly newspapers, The Sentinel and The Suburban, both owned by defendant Sentinel Publishing Co., Inc. (Sentinel), published a series of articles on the increased sale of bottled water in Milltown. By executive order of the Governor, water usage in Milltown and 87 other municipalities was restricted to 50 gallons of water per person, per day. Exec.Order No. 104 (Feb. 7, 1981). Shortly after a period of heavy rain, Milltown residents noticed that their tap water tasted odd and had a strong odor. As a result, sales of bottled water increased. Plaintiff, Dairy Stores, Inc., t/a Krauszer's Food Stores (Krauszer's), sold water bottled by Krauszer's Dairy, Inc. and distributed by Covered Bridge, Inc., neither of which was a party to this action. Between January and February 1981, sales at Krauszer's Milltown convenience store increased more than 50 percent, and in one week sales jumped from an average of 40 gallons to 700 gallons.

Defendant Kathleen Dzielak wrote three articles that were published in Sentinel newspapers about the water shortage, Milltown's water problem, and the bottled water industry. In

pursuing her story, she tried to learn the source of Krauszer's bottled water, which was sold under the label "Covered Bridge Crystal Clear Spring Water" (Covered Bridge). Krauszer's declined to identify the source, and Dzielak took a bottle of Covered Bridge water to an independent state-certified testing laboratory, New Jersey Dairy Laboratories. When Dzielak asked whether testing could prove that the water was spring water, the laboratory supervisor told her that a positive chlorine test result would exclude the possibility that the water came from a spring. Upon recognizing the Covered Bridge label, the supervisor advised Dzielak that Krauszer's was a customer of the laboratory, and that the supervisor was so sure Covered Bridge water did not contain chlorine that a test was "unnecessary." Nonetheless, at Dzielak's request, the supervisor tested the water and reported that it did not contain chlorine. Skeptical of the results, Dzielak took the bottle to another independent laboratory, defendant Paterson Clinical Laboratory (Paterson), for similar tests, stating that she was compiling information for an article. Paterson's laboratory director told her that exposure of the water to air made more difficult an accurate analysis of the sample. Nonetheless, in repeated tests, Paterson found that chlorine was present in the water. Dzielak took a second sealed bottle of Covered Bridge water to a third laboratory, Princeton Aqua Science, which submitted a report to Dzielak, who did not understand the results because they were expressed in a manner different from those in the other reports.

Based on her investigation, Dzielak wrote her stories and submitted them for publication. On March 11, 1981, Sentinel published the stories, two of which ran without a by-line under the headlines, "Water sales booming" and "Firms protect sources." The latter story concluded that current law did not require disclosure of the source of the water but that proposed regulations would require such disclosure. The third story was published with Dzielak's by-line and ran under a banner head-

line, "Spring water/Independent lab analysis casts doubt on content." The article began:

A sample bottle of "Covered Bridge Crystal Clear Spring Water," sold at Krauszer's convenient food stores, does not contain pure spring water, according to a laboratory analysis obtained by the Sentinel Newspapers.

Tests conducted on the product, purchased at the Krauszer's store at 23 N. Main Street, Milltown, showed a chlorine content of .1 parts per million. Ralph Pugliese, director of the state-certified Paterson Clinic Lab, which conducted the tests, said pure spring water should not contain any chlorine.

"I can't see how it could possibly be spring water unless the spring source was contaminated and chlorine was added at the source. Since we thought we were dealing with a spring water sampling, when we received a .1 reading we ran the test again four or five times and had two chemists look at it to make sure."

Because of the high rate of chlorine's dissipation, either by contact with air or other substances, Pugliese conjectured that at one point the water had contained a higher concentration of chlorine.

When Jerry McCloskey, national sales manager for Krauszer's, was informed of the lab results, he insisted that no chlorine is added to Covered Bridge water at any step of the operation and that the water does come from springs.

Sentinel rejected Krauszer's request for a retraction, whereupon Krauszer's instituted its complaint asserting a claim against Sentinel and Dzielak for defamation, which the Law Division viewed as including a claim for product disparagement. 191 *N.J.Super.* at 210 n. 2. As against Paterson, Krauszer's asserted a claim for negligence and for interference with prospective economic advantage, which the Law Division treated as a claim for defamation. *Id.* at 216–21.

Defendants moved for summary judgment, arguing that the relevant principle for determining their liability was whether they published the story with actual malice. The trial court found that "consumers have a First Amendment interest in obtaining information about the products or services they buy which is comparable to their interest in being informed about political and social issues. And the media has a corresponding right to convey that information." *Id.* at 214 (citations omitted). Continuing with its analysis, the trial court stated that by marketing its product, "a business voluntarily exposes itself— or at least its product or service—to public examination in much

the same fashion as does a public official or public figure." *Id.* at 215. These considerations led the court to conclude that Sentinel and Dzielak were protected by the first amendment in writing the story about Krauszer's bottled water. *Id.* at 216. The court found further that Paterson, as an outside consultant retained by Sentinel, was also entitled to first amendment protection. *Id.* at 216–21. Applying the actual malice standard to the facts, the court concluded that plaintiff had not established that the defendants knew the statements to be false or "entertained serious doubts of their truth." *Id.* at 222. Consequently, the court granted summary judgment in favor of all defendants.

In affirming substantially for the reasons set forth in the trial court's opinion, the Appellate Division referred to *Bose Corporation v. Consumers Union of United States, Inc.*, 466 *U.S.* 485, 104 *S.Ct.* 1949, 80 *L.Ed.*2d 502 (1984), which was decided by the United States Supreme Court after publication of the Law Division's opinion. The Appellate Division read *Bose* as extending the actual malice test to product disparagement. 198 *N.J.Super.* at 20.

At the outset, we must consider the distinction between causes of action for defamation and for product disparagement. The focus of our decision, however, is on the dispute whether the articles were privileged because they treated matters of public interest and, if so, whether the defendants were so careless that they lost the protection of any such privilege. In ruling for defendants, the lower courts looked to federal constitutional law and found that Krauszer's had not established that the defendants published the articles with "actual malice," a test that the United States Supreme Court has developed to measure statements about public officials and public figures. We find, however, that the characterization of Krauszer's as a public figure is problematic, and that the more appropriate principle is the common-law privilege of fair comment. Before embarking on a more detailed analysis of the principles of

defamation law, including fair comment, we must first determine the nature of the cause of action.

## –II–

Plaintiff has pursued the cause as one for defamation, but the cause could also be viewed as one for product disparagement. Indeed, the concurring opinion treats the case as if it were exclusively an action for product disparagement. We are sensitive, as was the Law Division, 191 *N.J.Super.* at 210 n. 2, to the potential implication of product disparagement principles, but we are constrained to decide the case as the parties and the lower courts have viewed it, as an action for defamation.

Although the two causes sometimes overlap, actions for defamation and product disparagement stem from different branches of tort law. A defamation action, which encompasses libel and slander, affords a remedy for damage to one's reputation. W.P. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on Torts* § 111 at 771 (5th ed. 1984) (Prosser & Keeton); *Restatement (Second) of Torts* § 559 (1965) (*Restatement (Second)*). By comparison, an action for product disparagement is an offshoot of the cause of action for interference with contractual relations, such as sales to a prospective buyer. Prosser & Keeton, *supra,* § 128 at 962–63; *Restatement (Second), supra,* § 623 comment g; 2 F. Harper, F. James & O. Gray, *Law of Torts* § 6.1 at 474 (2d ed. 1986) (Harper, James & Gray). The two causes may merge when a disparaging statement about a product reflects on the reputation of the business that made, distributed, or sold it. If, for example, a statement about the poor quality of a product implies that the seller is fraudulent, then the statement may be actionable under both theories. Prosser & Keeton, *supra,* § 128 at 964; *see, e.g., Lehigh Chem. Co. v. Celanese Corp. of Am.,* 278 *F.Supp.* 894, 896–97 (D.Md. 1968); *Harwood Pharmacal Co. v. National Broadcasting Co.,* 9 *N.Y.*2d 460, 463–64, 214 *N.Y.S.*2d 725, 727–28, 174 *N.E.*2d 602, 603–04 (1961); *Panster v. Wasserman,* 190 *A.D.* 822, 180

*N.Y.S.* 718 (1920); *Larsen v. Brooklyn Daily Eagle,* 165 *A.D.* 4, 150 *N.Y.S.* 464 (1914), *aff'd,* 214 *N.Y.* 713, 108 *N.E.* 1098 (1915). Courts generally are reluctant to impute a lack of integrity to a corporation merely from a criticism of its product. *See* Note, *Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation,* 75 *Colum.L. Rev.* 963, 970–71 (1975); Note, *Libel and the Corporate Plaintiff,* 69 *Colum.L.Rev.* 1496, 1499 (1969); Prosser & Keeton, *supra,* § 128 at 965. On the premise that the reputation of a business is more valuable than any particular product it sells, courts have responded more readily to a claim of damage to one's reputation than to a claim for product disparagement. *Bose Corp. v. Consumers Union of U.S., Inc.,* 508 *F.Supp.* 1249, 1270 (D.Mass.1981), *rev'd on other grounds,* 692 *F.*2d 189 (1st Cir.1982), *aff'd on other grounds,* 466 *U.S.* 485, 104 *S.Ct.* 1949, 80 *L.Ed.*2d 502 (1984). Semantics contributes to the confusion of the two causes because terms used to describe a product disparagement action, such as "trade libel" and "slander of title," tend to blur the distinction between such an action and one for defamation.

Recent decisions of the United States Supreme Court have further blurred the dividing line between the two causes. Traditionally, a plaintiff in a product disparagement action has borne the burden of establishing that the disparaging statement was both false and injurious. By comparison, in a defamation action, the plaintiff was entitled to a presumption that the defamatory statement was both false and harmful. *See* 2 Harper, James & Gray, *supra,* § 6.1A at 274; Comment, *The First Amendment and the Basis of Liability in Actions for Corporate Libel and Product Disparagement,* 27 *Emory L.J.* 755, 760–61 (1978); Note, *Corporate Defamation and Product Disparagement, supra,* 75 *Colum.L.Rev.* at 969 n. 29; Note, *Libel and the Corporate Plaintiff, supra,* 69 *Colum.L.Rev.* at 1497–99. Just this year, however, the United States Supreme Court held that when a statement treats a matter of public concern, the plaintiff in a defamation action has the burden of

proving that the statement is false. *Philadelphia Newspapers, Inc. v. Hepps,* —— *U.S.* ——, ——, 106 *S.Ct.* 1558, 1559, 89 *L.Ed.*2d 783, 787 (1986). Earlier the Court had ruled that a plaintiff was not entitled to presume damages from the publication of a statement about a matter of public concern, unless the statement was published with actual malice. *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 349–50, 94 *S.Ct.* 2997, 3012, 41 *L.Ed.*2d 789, 811 (1974); *see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 *U.S.* 749, 761, 105 *S.Ct.* 2939, 2946, 86 *L.Ed.*2d 593, 603–04 (1985). As a result, the difference between product disparagement and defamation has narrowed further when a statement treats a matter of public concern.

Here, Sentinel's article reported the presence of chlorine in Covered Bridge water and stated that Krauszer's kept the source of its bottled water a "well-guarded secret." Arguably, these statements not only disparaged Covered Bridge water by casting doubt on whether it was spring water, but also defamed Krauszer's corporate reputation by implying that it was trying to hide something through non-disclosure of the source of the water, *e.g.,* that the water did not come from a spring or that the spring was contaminated.

Because this matter was presented on review of an order granting defendants' motion for summary judgment, we view the facts in the light most favorable to the plaintiff, giving it the benefit of all favorable inferences that may legitimately be drawn from the record. *Viviano v. Sybron,* 101 *N.J.* 538 (1986). Thus, for the purposes of this appeal, we assume that the articles were not only disparaging, but also false and defamatory. As a result, the distinction between defamation and product disparagement disappears, and our attention shifts to whether the publications were privileged and whether the defendants abused any such privilege.

–III–

The evolution of the law of defamation reflects the tension between society's competing interests in encouraging the free

flow of information about matters of public concern and in protecting an individual's reputation. At one time, the common law placed so high a premium on the protection of a person's reputation that it imposed strict liability for the publication of a defamatory statement. Prosser & Keeton, *supra,* § 113 at 804. More recently, the United States Supreme Court has declared that publishers may not be held liable for certain defamatory statements without showing that they were at least negligent. *Gertz v. Robert Welch, Inc., supra,* 418 *U.S.* at 346–47, 94 *S.Ct.* at 3010, 41 *L.Ed.*2d at 809. That declaration is consistent with the increasing awareness of the need for public information on a wide variety of issues.

■ Traditionally, the common law has accommodated that need by recognizing that some otherwise defamatory statements should be "privileged," *i.e.,* that their publication does not impose liability on the publisher. Privileges may be "absolute," which means that the statements are completely immune, or "qualified." A qualified privilege may be overcome, with the result that the publisher will be liable, if publication of a defamatory statement was made with "malice." Common-law malice, or malice-in-fact, has meant variously that the statement was published with an improper purpose or ill will, or without belief or reasonable grounds to believe in its truth. *See Coleman v. Newark Morning Ledger Co.,* 29 *N.J.* 357, 374–75 (1959); 2 Harper, James & Gray, § 5.27 at 234–39; *Restatement of Torts* §§ 600, 601 (1938) (*Restatement*).

■ Certain statements, such as those made in judicial, legislative, or administrative proceedings, are absolutely privileged because the need for unfettered expression is crucial to the public weal. *See Rainier's Dairies v. Raritan Valley Farms, Inc.,* 19 *N.J.* 552, 558 (1955). Other statements, such as those made outside those forums but for the public welfare, enjoy a qualified privilege. *Coleman v. Newark Morning Ledger Co., supra,* 29 *N.J.* at 375–84; *Leers v. Green,* 24 *N.J.* 239, 253–55 (1957). For example, property owners have a qualified privi-

lege to make statements about potential drainage, health, and fiscal problems from a proposed trailer park. *Hohl v. Mettler*, 62 *N.J.Super.* 62, 66–67 (App.Div.1960). Likewise, citizens have a qualified privilege to make statements to authorities for the prevention and detection of crime. *Dijkstra v. Westerink*, 168 *N.J.Super.* 128, 134–36 (App.Div.), certif. denied, 81 *N.J.* 329 (1979). We have also recognized a qualified privilege of the press to report statements made in a public municipal council "conference room" meeting. *Swede v. Passaic Daily News*, 30 *N.J.* 320, 333–34 (1959). Therefore, a qualified or conditional privilege has emerged as one of the prime means for the common law to balance the interests in reputation with the publication of information in the public interest. *Restatement (Second), supra*, Conditional Privileges, Scope Note preceding § 593, at 258.

■ Insofar as defenses to product disparagement are concerned, a qualified privilege should exist wherever it would exist in a defamation action. Prosser & Keeton, *supra*, § 128 at 974; *Restatement (Second), supra*, § 646A. Because the common law historically has held the interest in one's reputation as more worthy of protection than the interest of a business in the products that it makes, it follows that the right to make a statement about a product should exist whenever it is permissible to make such a statement about the reputation of another.

■ One illustration of a qualified privilege is fair comment, which is sometimes described as rendering a statement non-libelous. No matter how described, the defense is lost upon a showing that the statement was made with malice. F. Harper & F. James, *Law of Torts*, § 5.28 at 457 (1956) (Harper & James). The roots of fair comment are imbedded in the common law, but in recent years, those roots have intertwined with others arising from constitutional law. Explanation of fair comment in its present form requires not only an exploration of its relationship to constitutional law, but also an analysis of the scope of the privilege, the extent to which it protects state-

ments of fact and opinion, and the kind of malice that will overcome it.

The constitutional considerations begin with *New York Times Co. v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964), in which the United States Supreme Court first declared that the first amendment protected certain otherwise defamatory statements. In that case, the Court drew upon a turn-of-the-century fair comment decision, *Coleman v. MacLennan*, 78 *Kan.* 711, 98 *P.* 281 (1908), which held that no matter how damaging to an individual's reputation, the freedom to make non-malicious statements about matters of public concern was essential for the public welfare. 376 *U.S.* at 280–82, 84 *S.Ct.* at 727, 11 *L.Ed.*2d at 706–07. The Court in *New York Times* ruled that a public official could not maintain a defamation action against a newspaper unless the statement was published with "actual malice," which the Court defined as publishing the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 *U.S.* at 279–80, 84 *S.Ct.* at 725–26, 11 *L.Ed.*2d at 706.

Three years after declaring that the actual malice test applied to public officials, the Court extended the test to public figures. *Curtis Publishing Co. v. Butts*, 388 *U.S.* 130, 87 *S.Ct.* 1975, 18 *L.Ed.*2d 1094 (1967). Then, in what has come to be regarded as the high-water mark of constitutionally-protected speech, a plurality of the Court declared the actual malice standard applicable to statements about private individuals who became involved in matters of public or general interest. *Rosenbloom v. Metromedia, Inc.*, 403 *U.S.* 29, 43, 91 *S.Ct.* 1811, 1819, 29 *L.Ed.*2d 296, 311–12 (1971). Since then, however, the Court has retrenched and declared that the actual malice test applies only to public figures or those private figures who become so involved in a particular public controversy that they become public figures for a limited range of issues. *Gertz v. Robert Welch, Inc., supra*, 418 *U.S.* at 351–52, 94 *S.Ct.* at 3012–13, 41 *L.Ed.*2d at 811–12.

Notwithstanding withdrawal of constitutional protection from matters of general or public interest, the Court recognized that states might want to grant broader speech protection in setting the appropriate standard of care in defamation actions concerning private individuals. *Gertz v. Robert Welch, Inc., supra,* 418 *U.S.* at 348–49, 94 *S.Ct.* at 3011, 41 *L.Ed.*2d at 810. Even before the United States Supreme Court accorded constitutional protection to statements about "public officials" and "public figures," the common law recognized that statements about matters of public concern should be protected. Through the principle of fair comment, courts have allowed commentary on public officials, private institutions that spend public funds, creative and scientific works presented to the public, and economic and social welfare events such as strikes and demonstrations. *See* Harper & James, *supra,* § 5.28 at 456–57; Prosser & Keeton, *supra,* § 115 at 831; Carman, *Hutchinson v. Proxmire and the Neglected Fair Comment Defense,* 30 *DePaul L.Rev.* 1 (1980). Although constitutional considerations have dominated defamation law in recent years, the common law provides an alternative, and potentially more stable, framework for analyzing statements about matters of public interest.

Another reason for turning to the common law is that the constitutional concepts do not comfortably fit the activities or products of a corporation. As the Law Division noted, the term "public figure" does not readily apply to corporate enterprises, and "public controversy" is poorly suited to describe the commercial activities of such an enterprise. 191 *N.J.Super.* at 212–13. The term "public figure" includes individuals who engage in a public controversy and ill fits a corporation, which ordinarily is interested not in thrusting itself into such a controversy, but in selling its products.

Lower federal courts, although differing on the nature and amount of activity needed to support the characterization of a corporation as a public figure, have concluded that corporations and their products can be viewed as public figures. *See, e.g., Steaks Unlimited, Inc. v. Deaner,* 623 *F.*2d 264, 280 (3rd

Cir.1980) (corporation that sold meat products is a public figure by virtue of intensive advertising campaign to attract customers); *Bose Corp. v. Consumers Union of U.S., Inc., supra,* 508 *F.Supp.* at 1273 (corporation is a public figure because it invited reviews and advertised extensively); *Reliance Ins. Co. v. Barron's,* 442 *F.Supp.* 1341, 1348 (S.D.N.Y.1977) (a corporation subject to state regulation of insurance is a public figure by virtue of owning more than a billion dollars in assets and offering its stock at a public sale). Other courts have noted, however, that the sale of a product "cannot easily be deemed a public controversy." *Bruno & Stillman v. Globe Newspaper Co.,* 224 *Ct.Cl.* 583, 633 *F.*2d 583, 589–90 (1st Cir.1980); *see also Martin Marietta Corp. v. Evening Star Newspaper Co.,* 417 *F.Supp.* 947, 956 (D.D.C. 1976) (finding public-figure analysis an "ill-fitting mold" and rejecting it for the public-interest test); *Vegod Corp. v. American Broadcasting Cos., Inc.,* 25 *Cal.*3d 763, 160 *Cal.Rptr.* 97, 603 *P.*2d 14 (1979), *cert. denied,* 449 *U.S.* 886, 101 *S.Ct.* 242, 66 *L.Ed.*2d 113 (1980) (concluding "that a person in the business world advertising his wares does not necessarily become part of a public controversy"); Fetzer, *The Corporate Defamation Plaintiff as First Amendment "Public Figure": Nailing the Jellyfish,* 68 *Iowa L.Rev.* 35, 37 (1982) ("to 'nail' the distinction between individual litigants and the illusive public figure is a formidable task, particularly when the claimant is a corporation"). Nonetheless, the Supreme Court has yet to address whether corporations or their products can be classified as public figures.

To summarize, the "public figure" device provides an awkward and uncertain method of determining whether statements about corporations or their products are actionable. Although the United States Supreme Court has withdrawn constitutional protection from statements on matters of public interest, the Court has left open to state courts the prospect of protecting such statements through common-law privileges, including fair comment. Providing such protection would be consistent with

the enhanced protection we have provided to speech in other areas. *See, e.g., State v. Schmid,* 84 *N.J.* 535 (1980), *appeal dismissed sub nom. Princeton Univ. v. Schmid,* 445 *U.S.* 100, 102 *S.Ct.* 867, 70 *L.Ed.*2d 855 (1982) (state constitution provides broader free-speech rights than federal constitution); *Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 187, *cert. denied,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982) (state Shield Law, *N.J.S.A.* 2A:84A–21, affords newspersons an absolute privilege not to disclose in libel action confidential sources concerning editorial processes). Thus, we turn to the analysis of the scope of the fair comment privilege.

## A

█ Generally speaking, the doctrine of fair comment extends to virtually all matters of legitimate public interest. Through the principle of fair comment, New Jersey courts have long accorded protection to wide-ranging statements about public officials. *Kotlikoff v. The Community News,* 89 *N.J.* 62, 65 (1982); *Leers v. Green, supra,* 24 *N.J.* at 258–59. The courts have likewise applied the principle to controversial public issues, such as internal security during the McCarthy era, *Coleman v. Newark Morning Ledger Co., supra,* 29 *N.J.* at 382–83, and to criticism of a proposed trailer park that was perceived as posing a threat to drainage, property values, and taxes, *Hohl v. Mettler, supra,* 62 *N.J.Super.* at 66–67. Drinking water, the subject of the present litigation, has also been held to be a topic of vital public concern and subject to fair comment. *Mick v. American Dental Ass'n,* 49 *N.J.Super.* 262, 280, 282–83 (App. Div.), certif. denied, 27 *N.J.* 74 (1958). In *Mick,* the Appellate Division sustained the dismissal of a libel action brought by a member-dentist against the American Dental Association. The dentist had opposed fluoridation of public drinking water. Thereafter, the Association responded to an inquiry about the dentist by stating it believed his views "to be based on complete misinformation and to be totally irresponsible." *Id.* at 271. Observing that fluoridation of drinking water affects the health

of citizens, the Appellate Division found the letter to deal with a subject of public interest relating to the general welfare. *Id.* at 280–81.

In like fashion, federal and state courts proceeding on constitutional analysis have recognized that information concerning products intended for human consumption, such as drinking water, or other matters of public health, require the plaintiff to prove actual malice to sustain a claim for defamation. *See Steaks Unlimited, Inc. v. Deaner, supra,* 623 *F.*2d 264 (actual malice standard applied to commentary on quality of meat); *Edwards v. National Audubon Soc'y, Inc.,* 556 *F.*2d 113 (2d Cir.), *cert. denied,* 434 *U.S.* 1002, 98 *S.Ct.* 647, 54 *L.Ed.*2d 498 (1977) (actual malice standard applied to criticism of scientists espousing use of DDT); *United Medical Laboratories, Inc. v. Columbia Broadcasting Sys., Inc.,* 404 *F.*2d 706 (9th Cir.1968), *cert. denied,* 394 *U.S.* 921, 89 *S.Ct.* 1197, 22 *L.Ed.*2d 454 (1969) (actual malice standard applied to commentary on medical testing labs); *Bose Corp. v. Consumers Union of U.S., Inc., supra,* 508 *F.Supp.* at 1271 (actual malice standard should apply to consumer product commentary because it "often relates to health or safety problems"); *Lewis v. Reader's Digest Ass'n,* 366 *F.Supp.* 154 (D.Mont.1973) (actual malice standard applied to criticism of uranium arthritis treatment); *Cera v. Mulligan,* 79 *Misc.*2d 400, 358 *N.Y.S.*2d 642 (Sup.Ct.1974) (actual malice standard applied to defamation of persons promoting chiropractic); *All Diet Foods Distribs., Inc. v. Time, Inc.,* 56 *Misc.*2d 821, 290 *N.Y.S.*2d 445 (Sup.Ct.1967) (actual malice standard applied to comments on the value of health foods); *Exner v. American Medical Ass'n,* 12 *Wash.App.* 215, 220–24, 529 *P.*2d 863, 869–70 (1974) (actual malice standard applied to defamation of person against fluoridating public drinking water supplies). *But see Bruno & Stillman, Inc. v. Globe Newspaper Co., supra,* 633 *F.*2d at 592 (rejecting importance of health and safety information as basis for applying actual malice standard to criticism of boat safety).

For its part, the United States Supreme Court, although it approved the public-interest standard in *Rosenbloom*, subsequently has withdrawn that approval because of the "difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' * * *." *Gertz v. Robert Welch, Inc., supra*, 418 *U.S.* at 346, 94 *S.Ct.* at 3010, 41 *L.Ed.*2d at 809. Commentators have criticized as illusory the Court's attempt to avoid the public-interest standard, noting that the distinction between public and private figures inevitably involves "consideration of the public interest in the particular communication." Hill, *Defamation and Privacy under the First Amendment*, 76 *Colum.L.Rev.* 1205, 1214–19 (1976); Frakt, *The Evolving Law of Defamation: New York Times Co. v. Sullivan to Gertz v. Robert Welch, Inc. and Beyond*, 6 *Rutgers L.J.* 471, 487 (1975) ("to determine when an individual has become a 'public figure for a limited range of issues' will necessarily entail *ad hoc* determinations of what is and is not a public issue"); Note, *Public Figures, Private Figures and Public Interest*, 30 *Stan.L.Rev.* 157, 175 (1977) ("Passing the public-interest test is a covert pre-condition to becoming a public figure"). While acknowledging that the task of discovering what is in the general or public interest will not always be easy, some state courts have assumed the responsibility for making that decision. *Diversified Management, Inc. v. Denver Post, Inc.*, 653 *P.*2d 1103, 1106 (Colo.1982); *AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 *Ind.App.* 671, 321 *N.E.*2d 580, 590 (1975), *cert. denied*, 424 *U.S.* 913, 96 *S.Ct.* 1112, 47 *L.Ed.*2d 318 (1976); *see Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 *N.Y.*2d 196, 341 *N.E.* 2d 569, 379 *N.Y.S.*2d 61 (1975) (holding that the test for determining liability for a news article concerned with a matter of "legitimate public concern" is "whether the publisher acted in a grossly irresponsible manner * * *"). Moreover, in its last two terms, the United States Supreme Court acknowledged that speech on matters of public, not private, concern lies at the heart of the first amendment. *Philadelphia Newspapers, Inc.*

*v. Hepps, supra,* —— *U.S.* at ——, 106 *S.Ct.* at 1563, 89 *L.Ed.*2d at 792; *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., supra,* 472 *U.S.* at 757–61, 105 *S.Ct.* at 2945–46, 86 *L.Ed.*2d at 602–03. Thus, the Court has not escaped the obligation of identifying matters of public concern.

We recognize that not everything that is newsworthy is a matter of legitimate public concern, and that sorting such matters from those of a more private nature may be difficult. In this regard, the assessment of public interest includes a determination whether the person "voluntarily and knowingly engaged in conduct that one in his position should reasonably know would implicate a legitimate public interest, engendering the real possibility of public attention and scrutiny." *Sisler v. Gannett Co., Inc.,* 104 *N.J.* 256, 274 (1986).

██ Some courts have developed criteria for determining whether the activities and products of corporations constitute matters of public interest. As previously indicated, matters of public interest include such essentials of life as food and water. *See Steaks Unlimited, Inc. v. Deaner, supra,* 623 *F.*2d 264; *All Diet Foods Distribs., Inc. v. Time, Inc., supra,* 56 *Misc.*2d 821, 290 *N.Y.S.*2d 445; *Exner v. American Medical Ass'n, supra,* 12 *Wash.App.* 215, 529 *P.*2d 863. Widespread effects of a product are yet another indicator that statements about the product are in the public interest. *Robinson v. American Broadcasting Cos.,* 441 *F.*2d 1396 (6th Cir.1971) (possible causes of cancer are a matter of public concern); *Lewis v. Reader's Digest Ass'n, supra,* 366 *F.Supp.* at 156 (article on an arthritis cure is in public interest because significant portion of population is afflicted with arthritis); *American Broadcasting Cos., Inc. v. Smith Cabinet Mfg. Co., Inc.,* 160 *Ind.App.* 367, 377, 312 *N.E.*2d 85, 90 (1974) (flammability of 25,000 baby cribs held to be matter of public interest); *Krebiozen Research Found. v. Beacon Press, Inc.,* 334 *Mass.* 86, 92–99, 134 *N.E.*2d 1, 6–9, *cert. denied,* 352 *U.S.* 848, 77 *S.Ct.* 65, 1 *L.Ed.*2d 58 (1956) (possible cures for cancer are matter of public concern). Still another

criterion is substantial government regulation of business activities and products. *See Reliance Ins. Co. v. Barron's, supra,* 442 *F.Supp.* at 1348 (insurance company found to be public figure because of state regulation of insurance and federal regulation of stock sales); *Coleman v. MacLennan, supra,* 78 *Kan.* at 734, 98 *P.* at 289 (freedom to make statements about matters of public concern "must apply to all officers and agents of government, municipal, state, and national; to the management of all public institutions, educational, charitable, and penal; to the conduct of all corporate enterprises affected with a public interest, transportation, banking, insurance; and to innumerable other subjects involving the public welfare"); *Steak Bit of Westbury v. Newsday, Inc.,* 70 *Misc.*2d 437, 334 *N.Y.S.*2d 325 (1972) (restaurant criticism is in public interest because of state regulation of food quality). Historically, restaurants also have been the subject of critical review. *See, e.g., Mr. Chow of N.Y. v. Ste. Jour Azur S.A.,* 759 *F.*2d 219 (2d Cir.1985); *Mashburn v. Collin,* 355 *So.*2d 879 (La.1977); *Twenty-five East 40th St. Restaurant Corp. v. Forbes, Inc.,* 30 *N.Y.*2d 595, 282 *N.E.* 2d 118, 331 *N.Y.S.*2d 29 (1972); *Wilson v. Sun Publishing Co.,* 85 *Wash.* 503, 148 *P.* 774 (1915); *cf. Mayfair Farms, Inc. v. Socony Mobil Oil Co.,* 68 *N.J.Super.* 188 (Ch.Div.1961) (denial of injunction against unfavorable rating in restaurant guide).

■ It would be anomalous to consider food and drink to be a subject of public interest when purchased in a restaurant, but not when purchased in a store. This conclusion applies with particular force to bottled drinking water, which is the subject of state regulation. Since 1924, New Jersey has regulated the sale of bottled drinking water, and anyone engaged in the business of bottling and selling drinking water must be licensed by and comply with regulations of the Department of Health. *N.J.S.A.* 24:12–5 & –6. As an essential of human life, drinking water is a paradigm of legitimate public concern. We leave to the future a more complete definition of matters of legitimate public concern. For this decision, it suffices to conclude that drinking water is such a subject.

Because the present case involves a product that is unquestionably a matter of legitimate public concern, we believe it is more prudent to extend that standard for the time being only to such products, leaving to another day the determination whether the standard should apply to statements about all products no matter how prosaic or innocuous. To this extent, we disagree with our concurring colleague, who would extend the actual malice standard to a disparaging statement about any product.

### B

Throughout the country, courts have divided on the issue whether fair comment should be restricted to statements of opinion or should extend to factual statements. Underlying the distinction is the premise that the widest possible latitude should extend to expressions of opinion on matters of public concern, but that factual misstatements should be more narrowly confined.

The majority view is that fair comment extends to opinion only, *Restatement, supra,* § 606; Harper & James, *supra,* § 5.28 at 456; Prosser & Keeton, *supra,* § 115 at 831; Note, *Fair Comment,* 62 *Harv.L.Rev.* 1207, 1211–12 (1949); Annot., 110 *A.L.R.* 412 (1937), but a respected minority view holds that statements of fact should also be protected. *Coleman v. MacLennan, supra,* 78 *Kan.* at 735, 98 *P.* at 286; Harper & James, *supra,* § 5.26 at 449–50; Hallen, *Fair Comment,* 8 *Tex.L.Rev.* 41 (1930). Although both strands are evident in our common law, the more traditional view has been that the fair comment "privilege" does not extend to factual statements. *Lindsey v. Evening Journal,* 10 *N.J.Misc.* 1275 (Sup.Ct.1932). The leading case of *Leers v. Green,* however, demonstrates this Court's willingness to extend the principle to factual statements. 24 *N.J.* at 257.

In *Leers,* the alleged defamatory writing was that an incumbent freeholder received a 500% profit of $10,000 on land his

family corporation sold to the county, and the defense was that the statement was fair comment. *Id.* at 243–45. The article presented some calculations of the amount of the profit. Because the land condemned by the county had been purchased in separate parcels and only portions were sold to the county, the exact profit was a debatable point. The Court concluded, however, that there was "no substantial misstatement of the gain." *Id.* at 257. Notwithstanding its declaration that the facts must be completely true, the Court recognized the need for leeway in stating facts about matters of public concern. *Id.* at 259–60.

More recently, in *Kotlikoff,* we found non-actionable a taxpayer's letter to the editor criticizing the Mayor and Tax Collector and suggesting that they were engaged in a "cover-up" to conceal the names of delinquent property owners. 89 *N.J.* at 65. The statement, which contained the facts on which it was based, was held to be protected opinion, rather than the accusation of specific criminal acts. *Id.* at 72. With respect to matters of legitimate public concern, therefore, we have edged toward the proposition that fair comment should apply not just to statements of opinion, but also to statements of fact.

Nonetheless, the difference between fact and opinion remains important. Statements of opinion, as a matter of constitutional law, enjoy absolute immunity. As Justice Powell has written, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc., supra,* 418 *U.S.* at 339–40, 94 *S.Ct.* at 3007, 41 *L.Ed.*2d at 805. Following *Gertz,* we have likewise declared that expressions of "pure" opinion on matters of public concern will not give rise to an action for defamation. *Kotlikoff v. The Community News, supra,* 89 *N.J.* at 69. Succinctly stated, a pure opinion is one that is based on stated facts or facts that are known to the parties or assumed by them to exist. *Id.* at 68–69. By comparison, a "mixed" opinion is one that is not

148

based on facts that are stated or assumed by the parties to exist. *Id.; Restatement (Second), supra,* § 566 comment b. In drawing the distinction between fact and opinion, we have looked to the content of the statement and to the context in which it appeared, finding guidance in other portions of the text, *Leers v. Green, supra,* 24 *N.J.* at 251, and to the manner in which the words were used, *Kotlikoff v. The Community News, supra,* 89 *N.J.* at 72. *But see* Prosser & Keeton, *supra,* § 113A at 813–15.

The need for the free flow of information and commentary on matters of legitimate public concern leads us to conclude that fair comment should extend beyond opinion to statements of fact. When confronting such a matter, a publisher should not be unduly inhibited in analyzing whether a statement is an immune opinion or a potentially culpable statement of fact. *Cf. Good Government Group of Seal Beach v. Superior Court,* 22 *Cal.*3d 672, 684, 586 *P.*2d 572, 578, 150 *Cal.Rptr.* 258, 264 (1978), *cert. denied,* 441 *U.S.* 961, 99 *S.Ct.* 2406, 60 *L.Ed.*2d 1066 (1979) (holding defendant liable for publishing a statement that "can reasonably be viewed as either fact or opinion" would impose a chilling effect on speech). We believe we come close to fulfilling the policy considerations that underlie fair comment if we evaluate factual statements as the subject of a qualified privilege. This conclusion leads to further consideration of the facts that will constitute an abuse of the privilege.

C

In traditional defamation analysis, one difference between absolute and qualified privileges is that an absolute privilege grants complete immunity to the publisher, but a qualified privilege accords immunity only if the statement is made without malice. *Rainier's Dairies v. Raritan Valley Farms, Inc., supra,* 19 *N.J.* at 558. The defense of fair comment, like other qualified privileges, may be overcome by

showing that a statement was made with malice. *Mick v. American Dental Ass'n, supra,* 49 *N.J.Super.* at 279. Previously this Court has sought to ascertain if the defendant's primary motive or purpose was ill will or the furtherance of the interest that is entitled to protection. *Coleman v. Newark Morning Ledger Co., supra,* 29 *N.J.* at 374–75. In that endeavor, "malice" means something different from the kind of malice that is implied from the intentional publication of a defamatory statement. *Id.* at 374. The various definitions of "malice" have led leading scholars to state that "[p]erhaps no word in law is used more loosely than 'malice,'" 2 Harper, James & Gray, *supra,* § 5.27 at 232, and that malice is a "meaningless and quite unsatisfactory term," Prosser & Keeton, *supra,* § 115 at 834.

Despite the ambiguity of the term, the United States Supreme Court imbued it with yet another meaning when promulgating the "actual malice" standard for assaying statements about public officials. As mentioned earlier, the Court defined "actual malice" as knowledge that the facts were false, or reckless disregard for their truth or falsity. *New York Times Co. v. Sullivan, supra,* 376 *U.S.* at 279–80, 84 *S.Ct.* at 725–26, 11 *L.Ed.*2d at 706.

As the actual malice standard has evolved, the relevant test is not "whether a reasonably prudent man would have published, or would have investigated before publishing," but "whether the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 *U.S.* 727, 731, 88 *S.Ct.* 1323, 1325, 20 *L.Ed.*2d 262, 267 (1968). That test, which is substantially subjective, is akin to the common-law requirement that to qualify as fair comment, a statement must honestly express the writer's true opinion. *Leers v. Green, supra,* 24 *N.J.* at 254; *Coleman v. MacLennan, supra,* 78 *Kan.* at 726, 98 *P.* at 286 (privilege overcome by showing that defendant did not have an honest belief in the truth of the facts); *see also Restatement, supra,* § 600 (1938) (abuse of conditional

privilege when the defendant "does not believe in the truth of the defamatory matter").

■ The bald assertion by the publisher that he believes in the truth of the statement may not be sufficient. *St. Amant v. Thompson, supra,* 390 *U.S.* at 732, 88 *S.Ct.* at 1326, 20 *L.Ed.*2d at 267. Notwithstanding a publisher's denial that it had serious doubts about the truthfulness of the statement, other facts might support an inference that the publisher harbored such doubts. As Justice White explained in *St. Amant:*

> The finder of fact must determine whether the publication was made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. [*Id.*]

■ The fair comment defense, the purpose of which is to foster the discussion of matters of legitimate public concern, is closely related to the constitutional protection accorded to statements about public officials and public figures. Although the adoption of the actual malice test is not constitutionally compelled, *Restatement (Second), supra,* § 580B comment c; 2 Harper, James & Gray, *supra,* § 5.27 at 233–34, we conclude that the defense of fair comment, like the constitutional protection, should be overcome only by proof of actual malice. *See Burke v. Deiner,* 97 *N.J.* 465, 476–77 (1984).

The term "malice" caused enough confusion when it was confined to the common law, but now that it has assumed a constitutional dimension, the confusion is compounded. Understandably, the differing definitions of "malice" have confounded trial courts. *See, e.g., Burke v. Deiner, supra,* 97 *N.J.* at 479 (trial court erred by including both definitions of malice in jury instructions); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., supra,* 472 *U.S.* at 754, 105 *S.Ct.* at 2943 n. 3,

86 *L.Ed.*2d at 597 n. 3 (quoting from the trial court's charge that confused the two definitions of malice).

 "Malice" adds nothing to the legal analysis of an allegedly defamatory statement, and it can become a pitfall in the underbrush of the common law. Consequently, we lose nothing by striking "malice" from the vocabulary of the common law of defamation. Prosser & Keeton, *supra*, § 115 at 834. Indeed, the *Restatement* eschews the term altogether, speaking instead of the "abuse of privilege." *Restatement (Second), supra*, § 599. It is more direct to recognize the legal consequences of the publication of certain statements without recourse to so ambiguous a word with such a checkered past. For example, we need not resort to the term "malice" to state that no one has a license to lie. Although we discard the label, we adhere to the principle that to overcome a qualified or conditional privilege, a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity. *Restatement (Second), supra*, § 600. With or without the term, the critical determination is whether, on balance, the public interest in obtaining information outweighs the individual's right to protect his or her reputation. *Coleman v. Newark Morning Ledger Co., supra*, 29 *N.J.* at 376.

As society in general, and the sale of goods in particular, becomes more complex, the general welfare requires the dissemination of more and more information to the consuming public. Consumers, who are often separated from those in the early stages of a chain of distribution, have a legitimate need to learn about the reputation of the business entities in that chain and of the goods that are being distributed. From that need emanates the right to publish information concerning the nature and quality of goods intended for human consumption, and the reputations of those who make, distribute, and sell those goods.

## D

We now turn to considering whether the actual malice test should apply to non-media, as well as media, defendants. The United States Supreme Court has never accorded preferential treatment to the media, notwithstanding that they are the common source of information on matters of public concern. Although the Vermont Supreme Court in *Dun & Bradstreet* had based its decision on a distinction between media and non-media defendants, the United States Supreme Court declined to draw that distinction, 472 *U.S.* at 752–53, 105 *S.Ct.* at 2942, 86 *L.Ed.*2d at 599, a point that was endorsed by Justice White and Justice Brennan in their separate opinions. *Id.* at 2953 (White, J., concurring); *id.* at 2957–59 (Brennan, J., dissenting). Consequently, the Court has accorded the same treatment to both media and non-media defendants. *See, e.g., St. Amant v. Thompson, supra,* 390 *U.S.* at 728, 88 *S.Ct.* at 1324, 20 *L.Ed.*2d at 265 (defendant was candidate for public office); *Garrison v. Louisiana,* 379 *U.S.* 64, 85 *S.Ct.* 209, 13 *L.Ed.*2d 125 (1964) (defendant was district attorney); *New York Times Co. v. Sullivan, supra,* 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (defendants included civil rights activists who placed ad, as well as newspaper in which ad was placed). The underlying premise is that citizens and newspapers alike may speak their minds on matters of public concern. *New York Times Co. v. Sullivan, supra,* 376 *U.S.* at 289–99, 84 *S.Ct.* at 736, 11 *L.Ed.* 2d at 719 (Goldberg, J., concurring). A majority of federal courts also have concluded that the actual malice test should apply to both media and non-media defendants. *See, e.g., Avins v. White,* 627 *F.*2d 637, 649 (3rd Cir.), *cert. denied,* 449 *U.S.* 982, 101 *S.Ct.* 398, 66 *L.Ed.*2d 244 (1980); *Davis v. Schuchat,* 510 *F.*2d 731, 734 (D.C.Cir.1975). Various state courts have reached the same result. *E.g., Antwerp Diamond Exch. of Am., Inc. v. Better Business Bureau of Maricopa Cty., Inc.,* 130 *Ariz.* 523, 637 *P.*2d 733 (1981); *Rodriguez v. Nishiki,* 65 *Hawaii* 430, 653 *P.*2d 1145 (1982); *Jacron Sales Co. v. Sindorf,* 276 *Md.* 580, 350 *A.*2d 688 (1976); *see also Restatement (Sec-*

*ond), supra,* § 580A comment h (constitutional protection should extend to private as well as public statements); Frakt, *Defamation Since Gertz v. Robert Welch, Inc.: The Emerging Common Law,* 10 *Rutgers L.J.* 519, 570–79 (1979) (the distinction between media and non-media defendants is obscure and constitutionally unjustifiable); Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 *Va.L.Rev.* 1349, 1403–08, 1416–18 (1975) (the distinction between media and non-media defendants is inappropriate in a discussion of the constitutional privilege to defame public figures).

█ In like fashion, we have extended the fair comment defense to non-media defendants. *Kotlikoff v. The Community News, supra,* 89 *N.J.* at 73 (fair comment extends to writer of letter to editor of newspaper); *Barbetta Agency, Inc. v. Evening News Publishing Co.,* 135 *N.J.Super.* 214, 222 (App. Div.1975) (assumed, without deciding, that media and non-media defendants should be treated alike); *Hohl v. Mettler, supra,* 62 *N.J.Super.* at 65 (defense applies to members of citizens group that placed advertisement in local newspaper and was source for newspaper article); *Mick v. American Dental Ass'n, supra,* 49 *N.J.Super.* at 279–84 (fair comment applies to letter from dental association to one member about another); *see also* Hill, *supra,* 76 *Colum.L.Rev.* at 1224 (common-law defense of fair comment has always been available to private defendants). Hence, we conclude that the actual malice standard should apply to non-media as well as to media defendants.

█ Even if we did not reach that conclusion, it would be inappropriate to distinguish between the independent expert, Paterson, and the media defendants. In an era when science and technology frequently touch our lives, the media have an increasing need for scientific and technical advice. The preparation of articles on a variety of topics that are the daily fare of newspapers, particularly those describing the quality of products intended for human consumption, may require expert

assistance. If an outside expert is held liable on a standard of care lower than that applicable to a media defendant, that expert may decline to conduct tests for reporters investigating important public issues. The effect would be to prevent the media from preparing publications with crucial information, or to preclude publication. This would have a chilling, or even freezing, effect on the dissemination of information that is in the public interest. We would be loathe to foreclose the media from vital sources that they need to speak intelligently on these matters. As a result, we conclude that outside experts that conduct tests and submit reports to the media are so closely related to news gathering that they should be treated like media defendants.

-IV-

Turning to Sentinel's articles, three statements are critical. The lead sentence in the article published under Dzielak's by-line states: "A sample bottle of 'Covered Bridge Crystal Clear Spring Water,' sold at Krauszer's convenient food stores, does not contain pure spring water, according to a laboratory analysis obtained by the Sentinel Newspapers." The next sentence states that the director of Paterson's laboratory said that "pure spring water should not contain any chlorine." The director continued by stating: " 'I can't see how it could possibly be spring water unless the spring source was contaminated and chlorine was added at the source.' "

We conclude that the statement that the Covered Bridge bottle "does not contain spring water" and that "pure spring water should not contain any chlorine" may fairly be viewed as statements of fact. Although testing for the presence of chlorine is a scientific procedure that results in the formulation of an opinion, the statement is more a factual assertion than an expression of an opinion.

We find, however, that the statement of the director that he "can't see how it could possibly be spring water unless

the spring source was contaminated and chlorine was added at the source" is an expression of pure opinion. It states the director's opinion, and the factual basis for it. For instance, the article recites that chlorine dissipates at a "high rate" on exposure to "air or other substances," and that tests were repeated several times to rule out testing error. It also states countervailing facts, such as that the seal had already been broken on the bottle containing the tested water. We conclude that the director's opinion was made on the basis of stated facts, and is a statement of "pure opinion," entitled to absolute immunity. *Gertz v. Robert Welch, Inc., supra,* 418 *U.S.* at 339–40, 94 *S.Ct.* at 3007, 41 *L.Ed.*2d at 805; *Kotlikoff v. The Community News, supra,* 89 *N.J.* at 69.

The Law Division, which found that the actual malice standard applied as a matter of federal constitutional law, determined that "the facts relied upon by Krauszer's in opposing summary judgment fell far short of providing a foundation for a finding by clear and convincing evidence that any defendant in fact subjectively entertained serious doubt as to the accuracy of the Paterson report." 191 *N.J.Super.* at 223–24. Just this year, the United States Supreme Court declared that a motion for summary judgment under Federal Rule 56, the counterpart to New Jersey Rule 4:46, implicated the "clear and convincing" standard of proof a plaintiff must meet at the trial of a libel action. *Anderson v. Liberty Lobby, Inc.,* —— *U.S.* ——, 106 *S.Ct.* 2505, 91 *L.Ed.*2d 202 (1986). The Court reasoned that the test for granting a motion for summary judgment is the same as that applicable to a motion for a directed verdict, to wit, whether the evidence presented would permit a rational factfinder to find actual malice by clear and convincing evidence. *Id.* at ——, 106 *S.Ct.* at 2511–12, 91 *L.Ed.*2d at 212–13. As a result, when the actual malice test applies as a matter of federal practice or constitutional law, the plaintiff must establish by clear and convincing evidence that the defendant published with actual malice. *Id.* at ——, 106 *S.Ct.* at 2514, 91 *L.Ed.*2d at 216.

In his dissenting opinion, Justice Brennan challenged the proposition that the test for determining whether a factual dispute is genuine for summary-judgment purposes is whether a reasonable jury could find for the non-moving party. *Id.* at ——, 106 *S.Ct.* at 2515–20, 91 *L.Ed.*2d at 216–223 (Brennan, J., dissenting). Such a determination would force the trial judge, Justice Brennan wrote, to weigh the evidence and would transform a motion for summary judgment "into a full blown paper trial on the merits." *Id.* at ——, 106 *S.Ct.* at 2519, 91 *L.Ed.*2d at 222 (Brennan, J., dissenting). He concluded that the ultimate burden of proof at trial is irrelevant and that the only question is whether the opposing affidavit raised a genuine issue of fact. *Id.* at ——, 106 *S.Ct.* at 2520, 91 *L.Ed.*2d at 222 (Brennan, J., dissenting).

Under federal law, *Liberty Lobby* would compel granting defendants' motion for summary judgment. As previously indicated, however, our decision is predicated on actual malice as a common-law concept. So viewed, our duty is to review the propriety of the summary judgment as a matter of state law. From that perspective, plaintiff has not raised a genuine issue of material fact that entitles it to a trial on the merits. *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 73–75 (1954); *R.* 4:46. Implicit in that determination is our belief that the appropriate standard to resolve a motion for summary judgment is not whether a rational finder of fact could find actual malice as a matter of clear and convincing evidence, but whether the opposing affidavits have created a genuine issue of material fact that defendants published with actual malice. It may be, as Justice Rehnquist suggested in his dissenting opinion in *Liberty Lobby,* that there is little practical difference between the two standards. *Anderson v. Liberty Lobby, Inc., supra,* —— *U.S.* at ——, 106 *S.Ct.* at 2521, 91 *L.Ed.*2d at 225 (Rehnquist, J., dissenting). We are persuaded, however, that the clear-and-convincing test inevitably implicates a weighing of the evidence, an exercise that intrudes into the province of the

jury. On balance, we believe that the better practice is to remain with the traditional test for summary judgment.

The dispositive question, then, is whether there is a genuine issue that any of the defendants displayed reckless disregard in publishing the two factual statements. Because this issue implicates the defendants' state of mind, we approach it with due respect for the difficulty of granting summary judgment dismissing the complaint. *Maressa v. New Jersey Monthly, supra,* 89 *N.J.* at 197 n. 10. Nonetheless, we recognize also that summary judgment practice is particularly well-suited for the determination of libel actions, the fear of which can inhibit comment on matters of public concern. By discouraging frivolous defamation actions, motions for summary judgment keep open lines of communication to the public on such issues. *Id.* at 196–98; *Kotlikoff v. The Community News, supra,* 89 *N.J.* at 67.

As to the two defamatory statements, nothing in the record before us creates a genuine issue of material fact that any defendant knew the statements to be false or entertained serious doubts about their truth. Paterson, knowing that the water was supposed to be spring water, confirmed the positive test results through subsequent tests, all of which were reviewed by two other chemists. This procedure does not bespeak a reckless disregard for the truth.

Insofar as Sentinel and its reporter are concerned, Dzielak started out carefully enough by seeking the services of an independent testing laboratory. The first laboratory found that the water did not contain chlorine, but upon learning that Krauszer's was a customer of that laboratory, Dzielak understandably sought confirmation elsewhere. Upon obtaining Paterson's positive test results for chlorine, she consulted still another laboratory, but she did not understand its report. A more careful reporter might have deferred publication until all doubts were finally resolved, but we cannot conclude that

Dzielak entertained serious doubts about the truth of her stories.

The judgment of the Appellate Division is affirmed.

GARIBALDI, J., concurring in the result.

*For affirmance*—Justices CLIFFORD, HANDLER, POL-LOCK, O'HEARN, GARIBALDI and STEIN—6.

*For reversal*—None.

GARIBALDI, J., concurring.

The plaintiff in this case has pursued a cause of action for defamation. The majority recognizes, however, that the cause of action could also be for product disparagement. *Ante* at 133. (Indeed, the majority assumes that the articles were not only defamatory, but also false and disparaging *(ante* at 135)). I find that plaintiff's cause of action is solely one for product disparagement. I join in the Court's judgment because I am satisfied that the requirement of actual malice should be applied in a product disparagement case.

## I

Product disparagement and defamation are two distinct torts. Although they sometimes overlap, there are important differences between them that arise primarily from the unique interests that they are intended to protect. Product disparagement protects injured plaintiffs, corporate or individual, by compensating them for pecuniary harm caused by false statements about their products. Defamation protects those plaintiffs' good name and character by compensating them for damage to their reputations. Succinctly stated, "[d]efamation of a corporation injures the reputation of the corporation: product disparagement injures the reputation of its products." Note, "Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation," 75 *Colum.L.Rev.* 963, 969 (1975) [hereinafter cited as Corporate Defamation Note]. For example, if a defendant declares that a company refuses to pay its debts, the reputation of the company will be damaged, but

its ability to sell its product will not be. The statement is defamatory, but it does not disparage a product. *Diplomat Elec. Inc. v. Westinghouse Elec. Supply Co.,* 378 *F.*2d 377 (5th Cir.1967). In contrast, if a defendant says that a company's product is of poor quality, its sales will be hurt, but public perception of its integrity and its reputation will not be affected. The statement disparages a product, but it is not defamatory. *Steak Bit of Westbury, Inc. v. Newsday, Inc.,* 70 *Misc.* 2d 437, 438, 334 *N.Y.S.*2d 325, 328 (Sup.Ct.1972).

The elements of proof for product disparagement are much more stringent than those for defamation.[1] Therefore, courts generally have been reluctant to find that a disparaging statement that merely criticizes a product is also defamatory. "[D]efamation is found only where the imputation fairly implied is that the plaintiff is dishonest or lacking in integrity, or that he is deliberately perpetrating a fraud upon the public by selling a product which he knows to be defective." W.P. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on Torts,* 965 (5th ed.1985). Thus, unless the disparaging statement explicitly imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in relation to the product, courts will not deem a merely critical statement to be defamatory. *Zerpol Corp. v. DMP Corp.,* 561 *F.Supp.* 404, 409 (E.D.Pa. 1983), citing *National Refining Co. v. Benzo Gas Motor Fuel*

---

[1]Before the Supreme Court's decision in *New York Times v. Sullivan,* 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 186 (1964), state courts found defendants who intentionally published defamatory statements strictly liable or liable without consideration of fault. W.P. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on Torts* § 804 (5th Ed.1984). Disparagement law was much less generous, requiring a showing of recklessness in most cases and negligence in many others. *Id.* at 969–70. In disparagement, truth was presumed and the plaintiff had to prove falsity, while in defamation falsity was presumed and the defendant had to show it was true. A disparagement plaintiff had to show special damages; in defamation, damages were presumed. Similarly, a disparagement plaintiff had to show that the plaintiff intended to cause injury; a defamation plaintiff did not. *See* Corporate Defamation Note, *supra,* 75 *Colum.L.Rev.* at 969–70.

*Co.,* 20 *F.*2d 763, 771 (8th Cir.), *cert.* denied, 275 *U.S.* 570, 48 *S.Ct.* 157, 72 *L.Ed.*2d 431 (1927).

In this case, one would have to read a great deal into Sentinel's articles to find a statement implying such fraud, deceit, dishonesty, or reprehensible conduct on Krauszer's part. Sentinel's statements were merely about Krauszer's product and affected only Krauszer's ability to sell that product. Krauszer's real concern was that its sales of bottled water and other products were hurt by the articles, precisely the type of injury for which a disparagement action is designed to compensate. Given the high standard that courts impose, I do not find Sentinel's statement critical of Krauszer's product to be defamatory. Thus, I need not reach the issue of what a corporate plaintiff in a defamation action must prove in order to receive damages from a media defendant.[2]

II

In the urban and highly-industrialized state of New Jersey, there have been surprisingly few court decisions expressly involving suits for product disparagement. *See System Operations v. Scientific Games Dev. Corp.,* 555 *F.*2d 1131, 1140 (3d Cir.1977); *Klein v. Millside Farms,* 8 *N.J.* 240 (1951); *Vaccaro v. DePace, Inc.,* 137 *N.J.Super.* 512 (Law Div.1975). For the closely-related tort of slander of title, see *Lone v. Brown,* 199 *N.J.Super.* 420 (App.Div.1985), certif. vacated, 103 *N.J.* 480 (1986); *Wendy's of South Jersey, Inc. v. Blanchard Manage-*

---

2 I do not support, however, the majority's position that the common law privilege of "fair comment" extends to factual statements. Along with the majority of states, I find that the "fair comment" privilege is relevant only to opinion. *See Restatement (Second) of Torts* § 606 (1977). The *Second Restatement* omits all reference to "fair comment" doctrine. *Cf. Restatement of Torts* § 606–10 (1934) (discussion of the "privileged criticism" doctrine). In *Kotlikoff v. Community News,* 89 *N.J.* 62, 65 (1982), we concluded "that the common law privilege of fair comment is no longer relevant" after *Gertz v. Welch,* 418 *U.S.* 323, 94 *S.Ct.* 2997, 41 *L.Ed.*2d 789 (1974). Hence, the doctrine of fair comment is inapplicable to this plaintiff's defamation action and offers no support for the majority's holding.

*ment Corp. of New Jersey,* 170 *N.J.Super.* 491 (Ch.Div.1979); *Rogers Carl Corp. v. Moran,* 103 *N.J.Super.* 163 (App.Div. 1968); *Frega v. Northern New Jersey Mortg. Ass'n,* 51 *N.J.Super.* 331 (App.Div.1958); *Andrew v. Deshler,* 45 *N.J.L.* 167 (E. & A. 1883).

In *Andrew v. Deshler,* this Court set forth the elements of the tort of product disparagement under New Jersey law as (1) publication (2) with malice (3) of false allegations about the plaintiff's product or property (4) that cause special damages (pecuniary harm).[3] 45 *N.J.L.* at 167. These elements are substantially identical to the cause of action for product disparagement set forth in the *Second Restatement:*

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
>
> (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity. [*Restatement (Second) of Torts* § 623A.]

Imposing this common-law actual malice standard on a plaintiff in a product disparagement action against a media defendant represents a proper accommodation between the public's right to a free and uninhibited press and the plaintiff's right to recover for injury to its product. To overcome a media defendant's strong constitutional right to print the news, a plaintiff must have a substantial countervailing interest such as the

---

[3] *Andrew v. Deshler* involved an action for slander of title. In New Jersey, the elements of product disparagement and slander of title are identical. *System Operations v. Scientific Games Dev. Corp.,* 555 *F.*2d 1131, 1140 (3d Cir.1977). Prosser treats the two actions together under the label "injurious falsehood." *Prosser on Torts* (5th Ed.), *supra,* at 962–77. The *Second Restatement of Torts* takes a similar position. *Restatement (Second) of Torts* § 623–26. Section 624 of the Second Restatement entitled "Disparagement of Property—Slander of Title," adopts the rules of section 623A, "Liability for Publication of Injurious Falsehood—General Principle." The applicability of section 623A to product disparagement is made explicit by section 626, which provides that rules as to liability for publication of injurious falsehood stated in section 623A apply to the publication of matter disparaging the quality of another's land, chattels or intangible things.

right of a private figure to his or her reputation and good name. *Sisler v. Gannett Co., Inc.*, 104 *N.J.* 256 (1986) (Garibaldi, J., concurring). A commercial entity's economic interest in the reputation of its product is not nearly as significant as an individual's interest in his or her reputation. *See Bose Corp. v. Consumer's Union of U.S., Inc.*, 508 *F.Supp.* 1249, 1270 (D.Mass.1981), rev'd, 692 *F.*2d 189 (1st Cir.1982), aff'd, 466 *U.S.* 485, 104 *S.Ct.* 1949, 80 *L.Ed.*2d 502 (1984).[4] Generally, a manufacturer or seller seeks public exposure for its product. By placing its products on the market, it invites examination and criticism, and has access to advertising further to explain and defend them.

In addition, the public has a substantial interest in gaining information about the quality and character of products. As the Supreme Court has said repeatedly, the First Amendment is designed to protect the reception of information as well as its publication. *See Virginia Bd. of Pharmacy v. Virginia Consumer Council*, 425 *U.S.* 748, 757, 96 *S.Ct.* 1817, 1823, 48 *L.Ed.* 2d 346, 355 (1976); *Procunier v. Martinez*, 416 *U.S.* 396, 94 *S.Ct.* 1800, 40 *L.Ed.*2d 224 (1974); *Pell v. Procunier*, 417 *U.S.* 817, 94 *S.Ct.* 2800, 41 *L.Ed.*2d 495 (1974). News reports that products are ineffective, dangerous, or even mislabeled are not merely useful, they are vital to citizens in a complex society

---

[4] In *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 *U.S.* 485, 104 *S.Ct.* 1949, 80 *L.Ed.*2d 502, 525 (1984), the Supreme Court, addressing only the issue of proof of actual malice, specifically expressed no view whether the *New York Times v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964), standard of "actual malice" applies to product disparagement cases. The Appellate Division in its *per curiam* opinion in this case held that the Court in *Bose* did implicitly extend the *New York Times v. Sullivan* "actual malice" test to product disparagement.

Here the primary defendant is a newspaper; hence, I do not address whether the actual malice standard of proof should be imposed on a plaintiff seeking to recover for a disparaging statement made by a competitor. There may be additional limited commercial speech considerations in such cases. For a discussion of the relationship of product disparagement by competitors and non-competitors to the First Amendment, see Corporate Defamation Note, *supra*.

who cannot begin to understand, let alone evaluate, every product on the market. *See Steaks Unlimited, Inc. v. Director*, 623 *F.*2d 264 (3d Cir.1980). As one court has stated:

The public's interest in obtaining information of this type is perhaps even greater than the corresponding interest in personal defamation actions, the interest in obtaining information about other people. Information obtained from product commentators often relates to health or safety problems in consumer products.... It would be unfortunate indeed if the threat of product disparagement actions stifled the free flow of such information. [*Bose Corp. v. Consumers Union*, 508 *F.Supp.* 1249, 1271 (D.Mass.1981) (citations omitted).]

To encourage the media to publish this consumer information it may be necessary to "protect some falsehood in order to protect speech that matters." *Gertz v. Welch*, 418 *U.S.* 323, 341, 94 *S.Ct.* 2997, 3007, 41 *L.Ed.*2d 789, 806 (1974).

### III

Therefore, applying the vital and more appropriate New Jersey common law of product disparagement to the present case, I conclude that the plaintiff has failed to prove the actual malice and special damages necessary for it to recover. Furthermore, I agree with the majority that the independent expert (Paterson Clinical Laboratory) retained by Sentinel may properly be considered an integral part of news gathering and hence may be treated as a media defendant in this action. Accordingly, I concur in the Court's judgment and would affirm the judgment of the Appellate Division.