969 A.2d 1145 (2009)
407 N.J. Super. 108
Robert SWAN and Lois Swan, h/w, Plaintiffs-Appellants,
v.
BOARDWALK REGENCY CORPORATION, d/b/a Caesar's Atlantic City, and Harrah's Entertainment, d/b/a Caesar's Entertainment, Inc., Defendant-Respondent.[1]
No. A-6229-07T1
Superior Court of New Jersey, Appellate Division.
Submitted March 11, 2009.
Decided May 7, 2009.
*1146 Golomb & Honik, P.C., Philadelphia, PA, for appellants (Richard M. Golomb, on the brief).
Cooper Levenson April Niedelman & Wagenheim, P.A., Atlantic City, for respondent (Gerard W. Quinn, on the brief).
Before Judges AXELRAD, PARRILLO and MESSANO.
The opinion of the court was delivered by
AXELRAD, P.J.A.D.
Plaintiffs appeal from summary judgment dismissal of their complaint alleging plaintiff Robert Swan[2] was wrongfully terminated in violation of public policy from his position as a surveillance officer at Caesars casino in Atlantic City and asserting a claim for "false light" invasion of his privacy. Following oral argument on July 3, 2008, Judge Perskie granted defendant partial summary judgment, holding as a matter of law that plaintiff did not set forth a claim for wrongful termination in violation of public policy, and entered an order on that date. Following defendant's subsequent motion and oral argument on August 1, 2008, the court dismissed the sole remaining count of the complaint, concluding a one-year statute of limitations applied to plaintiff's claim for "false light" invasion of privacy, for which he was time-barred, *1147 and entered an order on the same date.[3] We affirm.
Plaintiff was an at-will employee of defendant, Boardwalk Regency Corporation d/b/a Caesars Atlantic City (Caesars), from 1989 until his employment was terminated on June 16, 2005. Plaintiff performed surveillance activities for the casino and at the time of his termination worked in the surveillance department operating numerous closed-circuit TV cameras located throughout the casino premises, referred to as the "eye in the sky," which images appear on monitors in the surveillance department. Plaintiff was named as a defendant in a complaint brought by the Division of Gaming Enforcement (DGE) on April 26, 2005, which alleged that plaintiff and other surveillance officers at Caesars had improperly used surveillance cameras in October 2004 to observe and zoom in upon "selected parts of the anatomy of several females, both patrons and employees, on Caesars' premises, which observations and recordings are not permitted or authorized by the Casino Control Act or its regulations." Specifically, the complaint alleged that plaintiff was employed as a Lead Surveillance Officer in the surveillance room during the graveyard shift on October 3, 2004, when surveillance videotapes on monitors to which he was assigned recorded approximately eleven minutes of footage of such unauthorized surveillance.
The three other surveillance officers who had worked during the shifts in question were terminated from their employment. According to plaintiff, on June 16, 2005, a few days after Harrah's assumed control of Caesars pursuant to a merger, a supervisor advised him he was put on "investigative suspension" and would be notified when he could return to work. Two days later plaintiff received a letter dated June 16, 2005, confirming he was suspended pending investigation and that Caesars now found it necessary to terminate his employment. Richard Tartaglio, defendant's Director of Labor Relations/Atlantic City Properties, deposed that plaintiff was terminated after the DGE complaint was filed and an internal investigation, conducted prior to June 16, concluded plaintiff had improperly used the videotape surveillance equipment.
The charges made by the DGE became public and were widely disseminated through press reports in the newspaper as well as television. Three of the four people charged, which included plaintiff, requested a hearing before the Casino Control Commission (CCC). On September 27, 2005, the first day of trial, which was a *1148 public hearing, one of the employees entered into a settlement, as did Caesars, which admitted liability and agreed to pay a civil monetary penalty of $185,000. By initial decision of June 28, 2006, the CCC hearing examiner found the DGE failed to prove a regulatory infraction by plaintiff. The hearing examiner stated:
I accept [Swan's] explanation as credible and emphasize that an examination of the videotapes showed no misconduct on his part. The videotapes do not show that Swan used the surveillance equipment to zoom-in at close range on the breasts of female employees and patrons. Rather, the videotapes demonstrated that Swan was merely performing his job as a conscientious surveillance operator. Any close-up shot of a female was made in connection with legitimate surveillance functions. In my judgment, ascertaining the identify of persons on the casino floor is an acceptable use of resources in furtherance of legitimate surveillance functions. I note that the Division did not allege any impropriety on Swan's part as a supervisor. Thus, any potential liability for Swan was limited to his possible involvement personally in filming these women.
In contrast, the hearing examiner found the other employee misused surveillance equipment and sanctioned him. On August 16, 2006, the CCC formally adopted the initial decision.
On November 8, 2006, plaintiff filed the current action against Caesars, alleging he was wrongfully terminated "in violation of public policy" because when he worked the overnight shift as a surveillance officer at Caesars from October 3, 2004 to October 4, 2004, he was simply engaged in surveillance activity required under New Jersey's gaming regulations. Plaintiff explained:
18. That particular period of time was one in which surveillance officers were to be on heightened alert, as Caesar's had fallen victim to a large union strike which caused many of its employees such as dealers, waitresses, bartenders and the like to not report to work.
19. To alleviate this problem, Caesar's shuffled numerous non-union employees, who are typically not on the casino floor and thus not recognized by surveillance officers, into these unfilled jobs. The result was that, during this time-frame, unidentified and/or unknown people purportedly acting as employees roamed about the casino.
20. In this context, Mr. Swan observed three females that evening that caused him concern.
21. One female was a cocktail server. Mr. Swan only recognized this woman as a properly credentialed employee after zooming in on her face. After identifying this woman as a proper employee, Mr. Swan did not monitor her. Mr. Swan's surveillance of this employee lasted less than ten seconds.
22. Another female was working behind what was known as the "Toga Bar." This particular female was not readily known to Mr. Swan or anyone he was working with during that shift. Mr. Swan also had observed that a known "pimp" was sitting at the Toga bar, which was tended to by the aforesaid unknown female.
23. Concerned that this female was not authorized to be working behind the bar, Mr. Swan endeavored to identify who this woman was and to check her credentials against the surveillance department's list of verified employees.
24. To effectuate this inquiry, Mr. Swan manually zoomed one of the surveillance cameras onto this unknown female's upper torso in an attempt to read *1149 the name tag that was placed on the left side of her chest.
25. After identifying the name on said name tag, Mr. Swan cross checked the name with an employee log that was kept in the surveillance department's headquarters. The name did not appear in the log.
26. Consistent with his responsibilities, Mr. Swan attempted a more complete check. To do so, Mr. Swan attempted to verify that this female was a proper employee by locating another set of credentials that Caesar's employees are required to wear. This female wore these credentials on her left hip. After several unsuccessful attempts at locating these credentials, Mr. Swan identified them, zoomed in on them, and observed a proper "color dot" on the tag. After this point, Mr. Swan's surveillance of this person ended.
27. The third female appeared, from a distance, to be underage, but carrying a beverage. Concerned that he had identified an underage patron who was drinking an alcoholic beverage, Mr. Swan switched to another camera and obtained a view of this female's face from the front. A view of the female from the front suggested to Mr. Swan that this woman was not in fact underage. Mr. Swan conducted no further surveillance of this woman from that point on.
28. Each of the surveillances outlined above in ¶¶ 21-27 were recorded by the CCTV system in Caesar's surveillance department, and maintained on video-cassette.
In his "false light/invasion of privacy" claim against Caesars, plaintiff alleged that by his former employer issuing a press release and subsequently disseminating in a pass-along book and posting on a bulletin board copies of newspaper articles from the Atlantic City Press that described the allegations which were made against Caesars' employees, it created the false impression he was a "pervert who abused his position as a surveillance officer and used surveillance cameras to leer at and stalk females on the Casino floor."[4] The press release was a September 27, 2005 statement by Caesars, now owned by Harrah's, in response to the media coverage of the DGE proceedings, which apparently stated that "Harrah's has absolutely zero tolerance for the kind of behavior that occurred in October 2004. This activity occurred before the Harrah's-Caesar's June 2005 merger." According to plaintiff, this "false impression" would be "highly offensive to any reasonable person with ordinary sensibilities." Plaintiff further alleged that defendant "had knowledge of or acted in reckless disregard as to the falsity of the light in which they placed" him, resulting in extreme damage to plaintiff's reputation.
Plaintiff does not claim there are any material issues of fact, but challenges the legal conclusions of the trial court in dismissing his wrongful discharge claim on substantive grounds and his false light claim on time-bar procedural grounds. Plaintiff has never disputed that he was an at-will employee of the casino. He argues, however, that he was acting in furtherance of a clearly enunciated public policy and thus has a cause of action for wrongful discharge. A cause of action is recognized under Pierce if an employee is fired either in retaliation for the employee's refusal to commit an act which would violate a statute or "for assertion of a right protected *1150 by legislation." DeVries v. McNeil Consumer Products Co., 250 N.J.Super. 159, 171, 593 A.2d 819 (App.Div.1991); see Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980) (holding that the sources of such public policy include legislation, administrative rules, regulations or decisions and judicial determinations). According to plaintiff, it is not only a "right" at issue, but an affirmative and clearly stated statutory duty which he was acting pursuant to when he was conducting his surveillance activities in October of 2004.
The gist of plaintiff's theory is that because casinos are statutorily required to conduct video surveillance of the casino area so as to prevent theft, casino play by underage individuals, and generally monitor employees and patrons for security and loss prevention purposes, he was acting in furtherance of his mandatory legal duty to conduct the casino surveillance. Thus, he contends, the conscientious conduct of casino surveillance is an act of strongly enunciated public policy, and if those surveillance activities are properly performed, they further a clear public policy mandate of enforcing the broad regulatory scheme of the gaming industry in New Jersey. According to plaintiff, he proved on the merits before the CCC that he was performing his job as a conscientious surveillance operator.
Plaintiff further argues that Pierce also recognizes administrative decisions as a legitimate source of public policy and submits that the CCC's decision, made pursuant to its statutory authority to determine the merits of the allegation against him, demonstrates conclusively that his employer did not meet its burden of demonstrating entitlement to summary judgment on his wrongful termination claim in the trial court. According to plaintiff, because of the CCC's primary and comprehensive jurisdiction over the conduct of casino licensees and the use of surveillance equipment in conformity with its regulations, when the CCC determined that none of plaintiff's surveillance that was the subject of the DGE complaint was contrary to the regulations and that plaintiff properly performed his job, the trial court was mandated to find his termination was wrongful and in violation of public policy. "Under the doctrine of primary jurisdiction, when enforcement of a claim requires resolution of an issue within a special competence of an administrative agency, a court may defer to a decision of that agency." Campione v. Adamar, Inc., 155 N.J. 245, 263, 714 A.2d 299 (1998).
Plaintiff further contends that public policies were violated when he was terminated the same day as he was suspended pending an alleged "investigation" which, in actuality, never took place. According to plaintiff, his termination was clearly for the mere "PR" purposes of an incoming parent corporation that acted arbitrarily in the face of a potentially unpleasant situation occurring in the midst of a merger and did not want to be bothered by conducting any investigation into the merits of the allegations against him. As a result, he was left to successfully defend against those allegations, at his own considerable expense, only several months later.
We are not persuaded by plaintiff's arguments. Plaintiff was not fired in violation of a "clearly enunciated public policy" in which the casino directed him to turn off State-mandated video monitoring equipment, which he ignored and continued to properly conduct surveillance on the casino floor, or because the casino instructed him to conduct surveillance in a manner that he believed was improper or violative of CCC regulations. Rather, plaintiff was terminated because his employer believed he was not properly performing his job *1151 and/or because of the bad publicity to the casino surrounding the DGE charges of improper use of surveillance by its employees who worked the late-night shift.
As an at-will employee, in which his discharge was not violative of Pierce, Caesars had a right to terminate plaintiff with or without cause. Bernard v. IMI Sys., Inc., 131 N.J. 91, 105, 618 A.2d 338 (1993). Caesars was entitled to independently assess plaintiff's conduct and the situation. Caesars apparently made a business decision to terminate all of the at-will employees who were implicated in the scandalous allegations of using surveillance equipment to peer at selected portions of the anatomy of female patrons and casino workers, which is within the employer's power to do. The allegations contained in the DGE complaint were given wide publicity in the press and were obviously harmful to Caesars' reputation and its acceptance by the public. Moreover, according to Tartaglio, a review of the videotapes and plaintiff's inconsistent statements also led to the decision to terminate him.[5] Judge Perskie was not required to defer to the CCC's determination, as the CCC's ultimate finding that the DGE failed to prove a regulatory infraction by plaintiff is not binding on whether plaintiff could be terminated by Caesars with or without cause. Plaintiff fails to cite any case law which holds that a casino cannot terminate an at-will employee unless the CCC has first determined that that employee has engaged in some wrongdoing. We further observe that plaintiff's complaint does not allege, and the proofs do not demonstrate, that plaintiff was terminated in violation of any contractual provisions precluding his firing or granting him the right to an investigation or progressive discipline prior to termination. Accordingly, based on our review of the record, plaintiff's claim of wrongful termination was properly dismissed as a matter of law.
Plaintiff's second point on appeal pertains to the trial court's dismissal of his "false light/invasion of privacy" claim because it was not brought within one year of its accrual, i.e., the statute of limitations for defamation claims. N.J.S.A. 2A:14-3. Plaintiff asserts that the statutory limitations period is six years, pursuant to N.J.S.A. 2A:14-1, which applies to "any tortious injury to the rights of another not stated in sections 2A:14-2 and 2A:14-3...." According to plaintiff, a false light claim is neither libel nor slander, but rather is a separate and distinct privacy tort and thus N.J.S.A. 2A:14-3 cannot apply. Alternatively, plaintiff suggests this tort could be considered an "injury to the person" governed by the two-year limitations period of N.J.S.A. 2A:14-2. As the offending press release was published on September 27, 2005 and the complaint was filed on November 8, 2006, plaintiff thus contends the dismissal of its complaint as being time-barred was erroneous.
Plaintiff contends the trial judge improperly relied on a dicta statement in Rumbauskas v. Cantor, 138 N.J. 173, 182, *1152 649 A.2d 853 (1994). In that case our Supreme Court discussed several varieties of the invasion of privacy tort and how they were treated in various jurisdictions. The Court held that a stalking victim's claim against the stalker for invasion of privacy premised on stalkings and threats of violence, i.e., a tort of intrusion on seclusion, was a claim for "injury to the person" barred by the two-year limitations period set forth in N.J.S.A. 2A:14-2, not an "injury to the rights of another" barred by the six-year limitations period set forth in N.J.S.A. 2A:14-1. Rumbauskas, supra, 138 N.J. at 182, 649 A.2d 853. The Court reasoned that because the "defendant's conduct struck directly at the personhood of plaintiff." Ibid. In its analysis, the Court cited with approval Canessa v. J.I. Kislak, Inc., 97 N.J.Super. 327, 235 A.2d 62 (Law Div. 1967), which held that a six-year statute of limitations applied to an invasion of privacy claim, but distinguished that as applying to a separate classification of invasion of privacy torts, i.e., appropriation for the defendant's advantage of plaintiff's name or likeness. Id. at 178-83, 649 A.2d 853. Quoting Dean Prosser, the Court explained that invasion of privacy
"is not one tort, but a complex of four. The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff `to be let alone.'" [[Canessa, supra, 97 N.J.Super.] at 334, 235 A.2d 62 (quoting William L. Prosser, The Law of Torts § 112 (3d ed. 1964)).]
[Id. at 179-80, 649 A.2d 853.]
The Court further elaborated:
The four classifications that Dean Prosser propounded are: (1) intrusion (e.g., intrusion on plaintiff's physical solitude or seclusion, as by invading his or her home, illegally searching, eavesdropping, or prying into personal affairs); (2) public disclosure of private facts (e.g., making public private information about plaintiff); (3) placing plaintiff in a false light in the public eye (which need not be defamatory, but must be something that would be objectionable to the ordinary reasonable person); and (4) appropriation, for the defendant's benefit, of the plaintiff's name or likeness. W. Page Keeton, et al, Prosser and Keeton on the Law of Torts § 117 (5th ed. 1984).
In his explanation of the four types of invasion of privacy, Prosser has noted:
It should be obvious at once that these four types of invasion may be subject, in some respects at least, to different rules; and that when what is said as to any one of them is carried over to another, it may not be at all applicable, and confusion may follow.
[William L. Prosser, Privacy, 48 Cal. L.Rev. 383, 389 (1960).]
Prosser adds that almost all the confusion in the area is caused by the failure to separate and distinguish the four forms of invasion of privacy and to realize that they call for different treatment....
[Id. at 179-180, 649 A.2d 853.]
The Supreme Court then observed jurisdictions all around the country have "struggled" with classifying actions for invasion of privacy, noting "[o]ne of the most familiar difficulties is determining whether placing one in a false-light in the public eye should be regarded as defamatory in nature, thereby subjecting causes of action to the specific statutes of limitation applicable to defamation claims." Id. at 180, 649 A.2d 853. The Court summarized the consensus in other jurisdictions:

*1153 For example, because of the inherent similarities between false-light and defamation claims, the Supreme Court of Washington concluded that the same statute of limitations applies to both types of claims. Eastwood v. Cascade Broadcasting Co., 106 Wash.2d 466, 722 P.2d 1295, 1299 (1986). Similarly, the Supreme Court in California recognized the inherent similarities between false light invasion of privacy and defamation in Fellows v. National Enquirer, Inc., 42 Cal.3d 234, 228 Cal.Rptr. 215, 225 n. 12, 721 P.2d 97, 106 n. 12 (1986). See also Covington v. The Houston Post, 743 S.W.2d 345, 348 (Tex.Ct.App.1987) (holding that personal injury statute of limitations applied to false light defamation).
[Id. at 180-81, 649 A.2d 853.]
The Court then observed that invasion of privacy premised on "intrusion on seclusion" was governed in some jurisdictions by a personal injury statute of limitations, but not in others. Id. at 181-82, 649 A.2d 853.
After concluding that the intrusion on seclusion invasion of privacy tort before it was governed by the two-year statute of limitations, the Court went on to state:
The limitations periods applicable to actions involving other types of invasion of privacy are not before us. Invasion-of-privacy actions based on appropriation remain governed by the six-year statute of limitations period set forth in N.J.S.A. 2A:14-1. See Canessa, supra. Regarding actions for public disclosure of private facts or placing one in a false light, case law in other jurisdictions indicates that such actions are subject to the limitations period for defamation claims, which is one year in New Jersey. N.J.S.A. 2A:14-3....
[Id. at 183, 649 A.2d 853 (internal citation omitted).]
Contrary to plaintiff's assertion, Judge Perskie expressly noted there was no binding New Jersey law on the issue and the above-referenced comment at the end of the opinion in Rumbauskas was dicta. The judge also referenced an unreported decision by the U.S. District Court for the District of New Jersey, which directly addressed this issue and held that the statute of limitations for false light in New Jersey is one year as for defamation, N.J.S.A. 2A:14-3, as opposed to the two-year limitations period for injuries to the person, N.J.S.A. 2A:14-2. Botts v. New York Times Co., 2003 WL 23162315 (D.N.J. Aug.29, 2003), aff'd, 106 F.App'x 109 (3d Cir.2004).[6] The court in Botts cited Rumbauskas, supra, 138 N.J. at 181-82, 649 A.2d 853, for its recognition that false light invasion of privacy actions in other jurisdictions carry a one-year statute of limitations, as well as Rolax v. Whitman, 175 F.Supp.2d 720, 730 (D.N.J.2001), aff'd, No. 01-4229, 2002 WL 31528790 (3d Cir. Nov. 15, 2002) (table decision), which held the false light statute of limitations to be one year. Judge Perskie recognized the District Court's decision was not binding on him but noted he was persuaded by the court's evaluation of the nature of the cause of action and rationale of the decision, particularly in light of Dean Prosser's *1154 discussion. The motion judge could "perceive no rationale for concluding that the Legislature intended that a longer statute of limitations would apply" to a false light claim such as that alleged by plaintiff here, which was similar to defamation in that it "subject[ed] the victim to the consequences of defamation without the explicit nature of the claim." Accordingly, Judge Perskie held plaintiff's false light privacy claim was governed by the one-year statute of limitations applicable to defamation actions, N.J.S.A. 2A:14-3, and was thus time-barred.
Based on our analysis of the record and the applicable law, we, too, are persuaded that the nature of plaintiff's invasion of privacy claim is essentially one of defamation, and that the type of alleged objectionable conduct by defendant is dissimilar to that giving rise to the two-year statute of limitations ("intrusion on seclusion"), Rumbauskas, supra, or six-year limitations period ("appropriation"), Canessa, supra. After considering Dean Prosser's analysis and its review of the case law in New Jersey and other jurisdictions, the Rumbauskas Court was clearly of the opinion that different statutes of limitations would apply depending on the actual nature of the "invasion of privacy" claim. The Court quoted approvingly of decisions in other jurisdictions that applied the same statute of limitations to false light and defamation claims, Rumbauskas, supra, 138 N.J. at 180-82, 649 A.2d 853, giving the reader every reason to believe that although the Court did not have to reach the issue, it also would conclude that the one-year statute of limitations governing defamation actions would be applied in a "false light" action that was clearly grounded in allegations which were defamatory in nature.
In Eastwood, supra, cited in Rumbauskas, the Washington Supreme Court observed that "[w]hile all false light cases need not be defamation cases, all defamation cases are potentially false light cases[,]" quoting Dean Prosser's concern that the false light tort might be "capable of swallowing up and engulfing the whole law of defamation...." 722 P.2d at 1297 (quoting W. Prosser, Torts § 117 at 813 (4th Ed. 1971)). A significant number of other state and federal courts throughout the country have applied the same statute of limitations to false light and defamation claims, reasoning that holding otherwise would allow a plaintiff, in a defamation action where there has been a general publication, to avoid a shorter defamation statute of limitations merely by phrasing the cause of action in terms of invasion of privacy, which was a concern expressed by Dean Prosser. See Pierce v. Clarion Ledger, 433 F.Supp.2d 754, 757 (S.D.Miss. 2006), aff'd, 236 F.App'x 887, 889 (5th Cir. 2007); Tichenor v. Roman Catholic Church, 32 F.3d 953, 961 (5th Cir.1994); Gashgai v. Leibowitz, 703 F.2d 10, 13 (1st Cir.1983); Henderson v. MTV, 34 Med. L. Rep. 1725, 1727, 2006 WL 1193872 No. 05-1937, 2006 U.S. Dist. Lexis 25726 (D.D.C. May 3, 2006); Nichols v. Moore, 334 F.Supp.2d 944, 948-49 (E.D.Mich.2004); Grunseth v. Marriott Corp., 872 F.Supp. 1069, 1075 (D.D.C.1995), aff'd, 316 U.S.App.D.C. 367, 79 F.3d 169, 1996 U.S.App. Lexis 3688 (D.C.Cir. Feb. 9, 1996); Wagner v. Campbell County, 695 F.Supp. 512, 517 (D.Wyo.1988); Robinson v. Vitro Corp., 620 F.Supp. 1066, 1070 (D.Md.1985); Smith v. Esquire, Inc., 494 F.Supp. 967, 970 (D.Md.1980); West v. Media Gen. Convergence, Inc., 53 S.W.3d 640, 648 (Tenn.2001); Sullivan v. Pulitzer Broad. Co., 709 S.W.2d 475 (Mo.1986); Gannett Co. v. Anderson, 947 So.2d 1, 8-9 (Fla.Dist.Ct.App.2006); Magenis v. Fisher Broad., Inc., 103 Or.App. 555, 560, 798 P.2d 1106 (1990); Wiener v. Superior *1155 Court, 58 Cal.App.3d 525, 529, 130 Cal. Rptr. 61 (1976).
Neither law nor logic justifies why Count Two of plaintiff's complaint labeled "Defamation" should be subject to a one-year statute of limitations while his same claims re-labeled "False Light/Invasion of Privacy" in Count Three should be governed by a longer limitations period. To allow such a result would condone a transparent evasion of the one-year statute of limitations in New Jersey, and would be contrary to the implicit direction in Rumbauskas and the rationale expressed by the multitude of courts in other jurisdictions that apply the same statute of limitations to both false light privacy and defamation claims. As it is undisputed that plaintiff's complaint was not filed within one year of the "publication" asserted in Count Three, the claim was properly dismissed with prejudice as time-barred.
Affirmed.
NOTES
[1] Shortly after the complaint was filed, the parties executed a consent order to correct the name of defendant and properly identified it solely as "Boardwalk Regency Corporation d/b/a Caesars Atlantic City."
[2] Plaintiffs Robert and Lois Swan filed the complaint and appeal. The primary cause of action pertained to Robert Swan; Lois Swan asserted only a per quod claim. In this opinion "plaintiff" will refer to Robert Swan, and for simplicity the majority of our references will be to "plaintiff."
[3] Although the trial court's initial order of July 3, 2008 mistakenly states that defendant's motion for summary judgment was only granted as to Count Three, which is actually the false light/invasion of privacy claim, it is undisputed the court granted the motion to dismiss all of the claims of the complaint with the exception of Count Three in that order. The remaining Count Three was not dismissed until the August 1, 2008 order of the trial court. Thus, all of the counts of the complaint have been dismissed. Plaintiffs are only challenging the dismissal of the wrongful termination and false light claims.

Moreover, although plaintiffs supplied the August 1, 2008 transcript of oral argument, they chose not to order the July 3, 2008 transcript, and neither party referenced the court's analysis or reasons for its decision other than stating its conclusion. Although it would have been preferable to have that transcript to review, considering that on appeal of a summary judgment motion we apply the same standard as the trial court with respect to the motion record and determine whether the court's ruling on the law was correct, Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998), in the interest of judicial economy, we will decide plaintiffs' appeal on the merits.
[4] Caesars' issuance of the press release and use of the pass-along book and bulletin board also served as the sole basis for plaintiff's defamation cause of action in Count Two of the complaint.
[5] The deposition testimony of Frank Hauser, who worked as a surveillance officer at Caesars from February 2003 through March of 2006, and was currently employed as a surveillance officer at the Borgata, was presented with defendant's summary judgment motion. He testified that he was aware of plaintiff "crossing the line" and using video surveillance equipment at Caesars improperly; it was "a common practice" for plaintiff to zoom in on women. He also knew plaintiff had made copies of pornographic videotapes while at work, using Caesars' equipment. Hauser also testified he witnessed plaintiff falling asleep while on duty in the video surveillance room once or twice a week. It is unknown whether Hauser reported this conduct to management and, if so, whether it had any effect on the termination decision.
[6] Botts involved an advertisement published by the defendants promoting the United Negro College Fund depicting a young African-American man in front of a dilapidated trailer and holding a bottle of alcohol with a superimposed yearbook-type picture of the same man and positive quotation with designation "Larry Botts," which is also the name of the plaintiff and his son. The plaintiffs, who are college-educated Caucasians, alleged in part that the defendant invaded their privacy by placing them in a false light. The District Court judge found the plaintiffs' cause of action was more akin to defamation and thus applied a one-year limitations period.