**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2791-24
               A-2854-24

TREVOR MILTON,

     Plaintiff-Respondent,

v.

CNBC, INC.,

     Defendant-Appellant,

and

NATHAN ANDERSON and
HINDENBURG RESEARCH, LLC,

     Defendants.

_____

TREVOR MILTON,

     Plaintiff-Respondent,

v.

CNBC, INC.,

     Defendant,

NATHAN ANDERSON and
HINDENBURG RESEARCH, LLC,

      Defendants-Appellants.

_____

Argued October 28, 2025 – Decided December 16, 2025

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from interlocutory orders of the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-0532-25.

Bruce S. Rosen argued the cause for appellant CNBC, Inc. in A-2791-24 (Pashman Stein Walder Hayden, PC, attorneys; Bruce S. Rosen and CJ Griffin, on the briefs).

Patrick L. Rocco argued the cause for appellants Nathan Anderson and Hindenburg Research, LLC in A-2854-24 (Fleischman Bonner & Rocco, LLP, attorneys; Patrick L. Rocco, on the briefs).

Robert S. Frenchman (Dynamis, LLP) of the New York bar, admitted pro hac vice and Constantine P. Economides (Dynamis, LLP) of the New York, Florida, and District of Columbia bars, admitted pro hac vice, argued the cause for respondent Trevor Milton (Dynamis, LLP, Robert S. Frenchman and Constantine P. Economides, attorneys; Jamie H. Solano, Robert S. Frenchman and Constantine P. Economides, on the briefs).

PER CURIAM

In these related interlocutory appeals, which we consolidated for purposes of issuing a single opinion, defendants CNBC, LLC (CNBC), Nathan Anderson,

and Hindenburg Research, LLC (collectively with Anderson, Hindenburg), appeal from May 5, 2025 orders denying, in part, their orders to show cause (OTSC) pursuant to the New Jersey Uniform Public Expression Protection Act (UPEPA), N.J.S.A. 2A:53A-49 to -61, seeking dismissal of plaintiff Trevor Milton's complaint against them. Having reviewed the record and applicable law, we reverse those orders and hold that the court should have granted defendants' applications to dismiss. We, therefore, remand and direct the trial court to enter orders (1) dismissing plaintiff's complaint against all defendants with prejudice, and (2) awarding attorneys' fees and costs to defendants pursuant to N.J.S.A. 2A:53A-58.

I.

In 2015, Milton founded a privately held company, which later became Nikola Corporation (Nikola). According to Milton, Nikola's mission was to "revolutioni[ze] the trucking industry by designing and manufacturing low- or zero-emission heavy trucks" and "redefine freight transport by embracing sustainable energy solutions at a time when such ideas were almost inconceivable." Nikola's stated objectives included the development of a commercial hydrogen-electric semi-truck, the Nikola One, the production of

3

low-cost hydrogen at its facility in Arizona, and the development of an electric pickup truck, the Badger.

Milton was Chief Executive Officer and Chairman of the Board of Directors of Nikola from its inception until June 3, 2020, and Nikola's Executive Chairman from June 3, 2020, until September 20, 2020. On June 3, 2020, Nikola became a publicly traded company through a merger with a special purpose acquisition company (SPAC) in lieu of a traditional initial public offering (IPO).

Hindenburg "specialize[d] in investigative and forensic financial research on public companies, which it made available to the public at no cost." Hindenburg financed its work by taking "short positions" on the companies it investigated and "exposed as frauds, convinced that once the truth was known those companies and their share prices would falter." In August 2020, Hindenburg began investigating Nikola and established a short position on the company.

On September 10, 2020, two days after Nikola announced a strategic partnership with General Motors, Hindenburg published a report titled "Nikola: How to Parlay an Ocean of Lies into a Partnership with the Largest Auto OEM in America" (the Report). In the Report, Hindenburg claimed "Nikola [was] an intricate fraud built on dozens of lies over the course of its [f]ounder and

4

Executive Chairman . . . Milton's career" and it "ha[d] never seen this level of deception at a public company[.]"

Among other allegations, Hindenburg claimed Nikola falsely stated the Nikola One was a "fully function[al]" hydrogen-electric vehicle even though it had "no hydrogen capabilities whatsoever, it was built with natural gas components." According to the Report, Nikola "staged a video called 'Nikola One in Motion[,]' which showed the semi-truck cruising on a road at a high rate of speed" by having it "towed to the top of a hill . . . and simply filmed it rolling down the hill." Hindenburg also alleged Nikola falsely claimed that it "succeeded at cutting the cost of hydrogen by [eighty-one percent] compared to peers" and was "producing hydrogen." In fact, "Nikola ha[d] not produced hydrogen at this price or at <u>any</u> price."

On September 11, 2020, Nikola reported Hindenburg's allegations to the United States Securities and Exchange Commission (SEC), which began an investigation. Milton contends the Report and subsequent statements by Hindenburg sent "Nikola's stock plunging." On September 11 and 14, 2020, Nikola publicly disputed the claims in the Report. On September 21, 2020, Milton resigned as Executive Chairman of Nikola and never held a position at the company again.

A-2791-24

On November 12, 2020, Nikola confirmed to the SEC and the United States Department of Justice that "Hindenburg is correct in describing a number of statements by . . . Milton as misleading and/or false." Nikola also confirmed "[s]tatements by Milton to other Nikola executives suggest that Milton used social media to appeal to 'Robinhood investors' and hype Nikola to potential investors. This is corroborated by the oftentimes exaggerated nature of Milton's comments."

On July 29, 2021, the United States Attorney's Office for the Southern District of New York (U.S. Attorney) unsealed a criminal indictment charging Milton "with securities and wire fraud in connection with his scheme to defraud and mislead investors about the development of products and technology by" Nikola.[1] In a press release, the U.S. Attorney stated:

> From at least in or about November 2019 up through and including at least in or about September 2020, [Milton] engaged in a scheme to defraud investors by inducing them to purchase shares of Nikola . . . , the electric-and hydrogen-powered vehicle and energy company that [Milton] founded, through false and misleading statements regarding Nikola's product and technology development. [Milton's] scheme targeted individual, non-professional investors – so-called "retail investors" – by making false and misleading statements directly to the investing public through

---

[1] On June 22, 2022, Milton was charged in a superseding indictment with an additional unrelated fraud charge in connection with real property in Utah.

A-2791-24

social media and television, print, and podcast interviews.

. . . .

[Milton] took advantage of the fact that Nikola went public by merging with a [SPAC], rather than through a traditional IPO, by making many of his false and misleading claims during a period where he would have not been allowed to make public statements under rules that govern IPOs.

[Milton] made false claims regarding nearly all aspects of Nikola's business, including: (a) false and misleading statements that the company had early success in creating a "fully functioning" semi-truck prototype known as the "Nikola One," when [Milton] knew the prototype was inoperable; (b) false and misleading statements that Nikola had engineered and built an electric-and hydrogen-powered pickup truck known as "the Badger" from the "ground up" using Nikola's parts and technology, when [Milton] knew that was not true; (c) false and misleading statements that Nikola was producing hydrogen and was doing so at a reduced cost, when [Milton] knew that in fact no hydrogen was being produced at all by Nikola, at any cost; (d) false and misleading statements that Nikola had developed batteries and other important components in-house, when [Milton] knew that Nikola was acquiring those parts from third parties; and (e) false and misleading claims that reservations made for the future delivery of Nikola's semi-trucks were binding orders representing billions in revenue, when the vast majority of those orders could be cancelled at any time or were for a truck Nikola had no intent to produce in the near-term.

7

The same day Milton was indicted, the SEC charged him with violating anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 "for repeatedly disseminating false and misleading information . . . about Nikola's products and technological accomplishments." "The SEC complaint largely mirror[ed] the factual allegations set forth in the federal indictment[.]"

On December 21, 2021, the SEC announced Nikola "agreed to pay $125 million to settle charges that it defrauded investors by misleading them about its products, technical advancements, and commercial prospects." Subsequently, an arbitration panel ordered Milton to pay Nikola $167.7 million because it "found him liable for $121.25 million, or 97%, of Nikola's $125 million SEC civil fraud case penalty and to cover nearly $46.5 million in legal fees and expenses."

On September 12, 2022, Milton's criminal trial began. On October 4, 2022, while the trial was ongoing, CNBC aired "Chasing Tesla" as a part of its "American Greed" television series (the Broadcast). The Broadcast recounted the allegations set forth in the Report, the criminal indictments, and other actions that were pending against Milton, and included statements about Milton's previous business endeavors.

A-2791-24

On October 14, 2022, ten days after the Broadcast aired, a jury convicted Milton of two counts of wire fraud and one count of securities fraud. He was sentenced to four years in prison, ordered to forfeit property he owned in Utah, and ordered to pay a fine of $1 million. Milton contends the Nikola stock price fell from $117.90 per share on October 5, 2022, to $70 per share on November 21, 2022.

In June 2024, Milton filed a lawsuit in the United States District Court for the District of Arizona against former Nikola employees claiming they were responsible for his criminal conviction and economic losses from the decline in Nikola's stock value. Milton withdrew his lawsuit several weeks later.

## II.

On January 23, 2025, Milton filed his complaint in this action asserting causes of action for trade libel against CNBC and aiding and abetting trade libel against Hindenburg.[2] On March 27, 2025, Milton was granted a pardon by President Trump concerning his federal criminal convictions.

---

[2] Milton also asserted a cause of action for "prima facie tort" against CNBC and Hindenburg, which was dismissed by the trial court. Milton did not cross-appeal from the orders dismissing that cause of action. Milton's right to appeal that dismissal is therefore waived. R. 2:3-4(a); See Pressler & Verniero, Current N.J. Court Rules, comment 2 on R. 2:3-4 (2026) ("Ordinarily, a respondent . . . must cross-appeal in order to obtain relief from the judgment").

Milton contends the Broadcast "presented a false and deeply prejudicial narrative, portraying [him] as a devious, manipulative architect of a fraudulent enterprise." The Broadcast opened by "target[ing] Milton and Milton alone" and claimed he "'targets young, naïve investors.'" It "spotlights the Hindenburg brand and [R]eport logo, adding that it [was] 'taking aim' at Milton's 'high-flying hydrogen-powered greed.'"

Milton claims the Broadcast also included "false and misleading descriptions of [his] early ventures, portraying him as a charismatic yet deceptive entrepreneur." It depicted his prior businesses "as fraught with misrepresentation and failure and casting doubt on Milton's integrity before the inception of Nikola." This included a false claim that "Milton committed a crime by diverting accounts receivable from [one of his early businesses] to himself rather than the company."

Milton claims the Broadcast "completely ignored Nikola's public rebuttal, and [his] ongoing trial, choosing instead to recycle false and misleading accusations from the . . . Report." He contends the Broadcast characterized the "Nikola One in Motion" footage as a staged "corporate flimflam" by Milton even though "Milton was not even present during the filming" and did not coin the phrase "in motion." He also argues the Broadcast "besmirch[ed] the Nikola

10

A-2791-24

Badger" by "asserting falsely that it was merely a design or concept" even though "[t]wo drivable Badger prototypes were built by Nikola[.]"

Milton argues "[t]he defamatory smears continued" with "an on-camera interview" of "Jimmy Rex, an early Nikola investor and real estate agent, who claimed falsely that Milton told him and others during a trip in the summer of 2020 to sell their Nikola shares, presumably because he was aware that it was all going to come crashing down." In addition, the Broadcast falsely claimed Milton sold $300 million in stock sales in the three months after his indictment when "public records confirm[] [he] sold approximately $150 million worth of [Nikola] stock" during that period.

In support of his aiding and abetting claim against Hindenburg, Milton alleges, "[u]pon information and belief" that Hindenburg "knowingly and maliciously granted CNBC permission to utilize its logo and materials from the . . . Report." He also contends, again "[u]pon information and belief," that CNBC requested "Hindenburg verify various assertions in the . . . Report as part of CNBC's journalistic source-checking protocols" and Hindenburg "maliciously failed to correct, modify, or clarify these assertions."

Milton contends the Broadcast caused "harm to [his] professional reputation." He claims his "professional relationships . . . suffered irreparable

damage as a result of" the Broadcast. He alleges "[m]ultiple clean-energy ventures [he] sought to develop post-Nikola were derailed" by "reputational concerns."

He was "blocked from purchasing, among other things, the Badger program and the Powersports Division" from Nikola, and "[b]anks and brokerage firms terminated [his] accounts and/or refused his business[.]" In addition, the Broadcast "created a chilling effect on [his] ability to rehabilitate his career." Finally, he "experienced a significant devaluation of his remaining stake in Nikola . . . in the days and weeks following the [B]roadcast." The Broadcast, "caused severe harm to him personally, financially, and reputationally" and Milton "seeks to retore his business reputation[.]"

## III.

On March 21, 2025, CNBC applied for an OTSC pursuant to UPEPA, N.J.S.A. 53A-51, seeking dismissal of the complaint and an award of attorneys' fees and costs. On March 24, the court entered CNBC's OTSC. On April 4, Hindenburg applied for an OTSC seeking the same relief, which the court entered on April 9. The court heard oral argument on April 23.

On May 5, the court entered orders granting in part and denying in part the relief sought in the OTSCs, supported by written opinions. The court

determined CNBC and Hindenburg established UPEPA applies to the causes of action set forth in Milton's complaint. The court also dismissed Milton's cause of action for "prima facie tort" against CNBC and Hindenburg because it was "improperly being used as a substitute for other recognized causes of action . . . asserted in the complaint."

The court rejected defendants' claim that Milton's cause of action for trade libel was actually a claim for defamation that is barred by the one-year statute of limitations (SOL) applicable to defamation claims pursuant to N.J.S.A. 2A:14-3. It found "the same statement can become actionable under both defamation and trade libel" and the causes of action "overlap when a statement disparages a product or business and simultaneously reflects negatively on the reputation of the individual or entity associated with it."

The court determined "[d]efamation . . . provides a remedy for damage to an individual's or entity's reputation." "In contrast, trade libel, also known as product disparagement, addresses false statements that cause pecuniary loss by injuring the reputation of a product or business." "If a statement imputes personal misconduct or reprehensible characteristics, it is considered defamatory[,]" "[h]owever, if it solely criticizes the quality of a product or the character of a business, it is regarded as trade libel." The court concluded,

13

"[m]any statements may implicate both causes of action, . . . as in the present matter" and "for purposes of the motion to dismiss standard, the cause of action for trade libel [wa]s properly plead[ed]."

The court concluded Milton adequately pleaded special damages sufficient to survive a motion to dismiss for failure to state a claim. It found, "[e]ven excluding the loss of value of stock . . . Milton . . . identifie[d] specific lost business opportunities and professional disruptions, including canceled stock transactions, terminated banking relationships, and the blocked acquisition of Nikola's Badger program."

The court also determined "for purposes of a motion to dismiss, Milton has sufficiently plead[ed] factual allegations demonstrating actual malice in looking at the complaint with a liberal and generous reading." Specifically, "CNBC's reliance on sources known to be biased, the deliberate omission of available exculpatory information, and the strategic timing of the [B]roadcast during Milton's criminal trial[.]"

The court rejected CNBC's defense based on the "fair report privilege" because the Broadcast "prominently featured a host of potentially libelous assertions that" were not "sourced from official proceedings or covered by

14

the . . . privilege." It found "the privilege for purposes of the relevant motion to dismiss standard, does not apply."

As to Hindenburg, the court determined Milton "sufficiently pled a [cause of action] of aiding and abetting liability" based on the allegations that Hindenburg "intentionally reaffirmed false and misleading statements from [the Report] directly to CNBC" and "explicitly authoriz[ed] CNBC to use" the Report and "the Hindenburg logo and imagery" in the Broadcast. The court did not address defendants' claims for attorneys' fees and costs.

Defendants appealed pursuant to N.J.S.A. 2A:53A-57 and Rule 2:2-3(a)(3).[3] On June 26, 2025, we granted defendants' motion to stay the court proceedings pursuant to N.J.S.A. 2A:53A-52 and expedited the appeal.

On appeal, CNBC argues Milton's trade libel claim is a personal defamation claim "re-package[d] . . . into 'trade libel' so that he can evade defamation's strict one-year [SOL]." CNBC argues "at the time of the [B]roadcast, Milton . . . had no product." "He was neither a Nikola corporate executive, nor were Nikola or Nikola's hydrogen trucks [Milton's] products. He was simply a shareholder." CNBC contends "even if the [Broadcast] wrongly

---

[3] UPEPA provides "[a] moving party may appeal as a matter of right from an order denying, in whole or in part, an [OTSC] . . . not later than [twenty] days after entry of the order." N.J.S.A. 2A:53A-57.

15

disparaged Nikola's products . . . Nikola is not a plaintiff" and Milton does not have "standing to sue individually for harm resulting from disparagement" of Nikola's products.

CNBC also contends Milton failed to plead special damages necessary to support a claim for trade libel, the fair report privilege applies to the allegedly defamatory statements contained in the Broadcast, and Milton failed to plead actual malice necessary to support a claim of defamation or trade libel. Finally, CNBC argues it is entitled to a statutory award of attorneys' fees and costs pursuant to UPEPA. N.J.S.A. 2A:53A-58.

Hindenburg argues that without a viable claim against CNBC, "Milton's aiding and abetting claim against [Hindenburg] cannot stand."[4] Hindenburg additionally argues Milton failed to allege facts sufficient to support his claim that Hindenburg aided and abetted CNBC's alleged trade libel.

IV.

We review a decision on the interpretation and application of a statute, such as UPEPA, de novo. Pugliese v. State-Operated Sch. Dist. of City of Newark, 454 N.J. Super. 495, 503 (App. Div. 2018). We also review a trial

---

[4] At oral argument before us, counsel for Milton conceded there can be no viable aiding and abetting claim against Hindenburg if Milton's trade libel claim against CNBC is dismissed.

court's decision to grant or deny a motion to dismiss pursuant to Rule 4:6-2(e) de novo, applying the same standard as the trial court. Smith v. Datla, 451 N.J. Super. 82, 88 (App. Div. 2017) (citation omitted). This includes "pure questions of law raised in a dismissal motion, such as the application of a statute of limitations[.]" Ibid. (citing Royster v. N.J. State Police, 227 N.J. 482, 493 (2017) (citation omitted)).

Based on our de novo review, we hold Milton's claim against CNBC was one for defamation rather than trade libel and is barred by the one-year SOL applicable to defamation claims. The court, therefore, improperly denied defendants' OTSCs under UPEPA to dismiss Milton's purported cause of action for "trade libel" against CNBC and the cause of action for aiding and abetting against Hindenburg.

### A.

UPEPA applies to:

> a cause of action asserted in a civil action against a person based on the person's:
>
> (1) communication in a legislative, executive, judicial, administrative, or other governmental proceeding;
>
> (2) communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding; or

17

(3) exercise of the right of freedom of speech or of the press, the right to assembly or petition, or the right of association, guaranteed by the United States Constitution or the New Jersey Constitution, on a matter of public concern.

[N.J.S.A. 2A:53A-50(b).]

Among other exceptions not relevant to the arguments raised in this case, UPEPA "does not apply to a cause of action asserted . . . against a person primarily engaged in the business of selling . . . goods or services if the cause of action arises out of a communication related to the person's sale . . . of the good or services." N.J.S.A. 2A:53A-50(c).

"Not later than [sixty] days after a party is served with a . . . pleading that asserts a cause of action to which [UPEPA] applies . . . , the party may file an application for an [OTSC] . . . to dismiss the cause of action or part of the cause of action." N.J.S.A. 2A:53A-51. "The court shall hear an [OTSC] under [UPEPA] as expeditiously as possible[,]" N.J.S.A. 2A:53A-53(a), and "rule . . . as soon as practicable after a hearing[.]" N.J.S.A. 2A:53A-56.

In ruling on the OTSC, the court "may consider the pleadings, the [OTSC] application and supporting certifications, briefs, any reply or response to the [OTSC], and any evidence that could be considered in ruling on a motion for summary judgment." N.J.S.A. 2A:53A-54. The court is required to construe

18

UPEPA "broadly . . . to protect the exercise of the right of freedom of speech and of the press, the right to assembly and petition, and the right of association, guaranteed by the United States Constitution or the New Jersey Constitution." N.J.S.A. 2A:53A-59. Additionally, "in applying and construing this uniform act, consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." N.J.S.A. 2A:53A-60.

UPEPA establishes a two-stage process a court must follow "in ruling on an [OTSC.]" N.J.S.A. 2A:53A-55(a). The court must first determine whether UPEPA applies to the causes of action alleged. Specifically, that: "(1) the moving party established . . . [UPEPA] applies; [and] (2) the responding party fail[ed] to establish . . . that [UPEPA] does not apply" based on the exceptions enumerated in N.J.S.A. 2A:53A-50(c). N.J.S.A. 2A:53A-55(a)(1-2).

If UPEPA applies, "the court shall dismiss with prejudice a cause of action, or part of a cause of action, if . . . either:"

> (a) the <u>responding party</u> fails to establish a prima facie case as to each essential element of any cause of action in the complaint; or
>
> (b) The <u>moving party</u> establishes that:
>
>> i. The responding party failed to state a cause of action upon which relief can be granted; or

ii. There is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

[N.J.S.A. 2A:53A-55(a)(3) (emphasis added).]

In this case, Milton concedes UPEPA applies to his cause of action against CNBC and "supplies the threshold framework for CNBC's" OTSC. Pursuant to the express provisions of the statute, a responding party, in this case Milton, must "establish a prima facie case as to each element of any cause of action" to survive the second stage of the UPEPA analysis. If the responding party fails to make that showing, the cause of action "shall" be dismissed with prejudice.

To establish a prima facie case, a responding party must do more than merely allege the elements of a cause of action. The party must provide some evidence to establish the elements of the claim. See State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999) (stating, "in order to establish a prima facie claim, a petitioner must do more than make bald assertions that he was denied the effective assistance of counsel"); see also State v. Scott, 474 N.J. Super. 388, 404 (App. Div. 2023) (stating, "[a] prima facie case is one in which the evidence, including any favorable inference drawn therefrom, could sustain a judgment"); see also New Jersey Division of Child Protection and Permanency v. J.R.-R., 248 N.J. 353, 370 (2021) ("[P]rima facie evidence [is] [e]vidence that

will establish a fact or sustain a judgment unless contradictory evidence is produced" (internal quotation marks omitted)).[5]

Although the prima facie case standard is not rigorous, it requires a showing more robust than that necessary to defeat a motion to dismiss for failure to state a claim pursuant to Rule 4:6-2(e). In deciding a motion to dismiss for failure to state a claim, the court must carefully examine the allegations "to ascertain whether the fundament of a cause of action may be gleaned even from

---

[5] This definition is consistent with the Uniform Law Commission's Uniform Public Expression Act – Summary, which states "the responding party must provide evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." Public Expression Protection Act, Unif. L. Comm'n (Dec. 8, 2025, at 20:05 UTC), https://www.uniformlaws.org/committees/community-home?CommunityKey=4f486460-199c-49d7-9fac-05570be1e7b1 (under the "Summary" tab).

Courts in other jurisdictions that have enacted versions of the uniform act have similarly required the responding party to produce evidence in support of their prima facie case. See Mackey v. Krause, 575 P.3d 1162, 1175 (Utah 2025) (noting that a plaintiff must present some evidence to establish a prima facie case to satisfy UPEPA); Davenport Extreme Pools & Spas, Inc. v. Mulflur, 698 S.W.3d 140, 157 (Ky. Ct. App. 2024) (finding the plaintiff "needed more evidence to make his case" to sufficiently allege a prima facie case for tortious interference); Jha v. Khan, 520 P.3d 470, 482 (2022) (finding plaintiff failed to make a prima facie showing of invasion of privacy by false light under UPEPA because plaintiff presented "no evidence that the statements made by [defendant] were provably false"). As expressly provided in UPEPA, it is appropriate to consider the Uniform Law Commission's statement and decisions from other jurisdictions to "promote uniformity" of this uniform act "among states that enact it." N.J.S.A. 2A:53A-60.

an obscure statement of claim[.]"  Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 746 (1989).  The "test for determining the adequacy of a pleading [is] whether a cause of action is 'suggested' by the facts."  Ibid. Therefore, the court must view the allegations made with great liberality and without concern for the party's ability to prove the alleged facts.  See Ibid.

In deciding the OTSCs, the court incorrectly conflated Milton's initial burden to make a prima facie showing with the moving parties' burden to establish Milton failed to state a viable cause of action.  That is, the court denied the OTSCs because it found Milton merely stated a viable cause of action, not because Milton established a prima facie case.  That was improper because Milton could not survive the second stage of the UPEPA analysis unless he established a prima facie case as to each essential element of any cause of action in the complaint.  It is not necessary for us to address that issue in greater detail because, even if Milton could establish a prima facie case, his cause of action against CNBC is barred by the SOL and his cause of action against Hindenburg fails as a result.

## B.

We are convinced Milton's purported "trade libel" claim against CNBC is a defamation claim relabeled as trade libel to evade the applicable SOL.  It is

22

well-settled that "[i]t is not the label placed on [a cause of action] that is pivotal but the nature of the legal inquiry." Couri v. Gardner, 173 N.J. 328, 340 (2002). Applying this rule, where a cause of action sounds in defamation, courts must treat the claim as defamation regardless of the label a plaintiff chooses to attach to it. Otherwise, plaintiffs could "overcome defenses to defamation actions, to avoid short [SOLs] for defamation" by simply relabeling the claim as another tort. Decker v. Princeton Packet, Inc., 116 N.J. 418, 432 (1989). See also Swan v. Boardwalk Regency Corp., 407 N.J. Super. 108, 121-23 (App. Div. 2009) (concluding where a claim is "essentially one of defamation" allowing it to stand as a claim for false light would "condone a transparent evasion of the one-year [SOL]").

"A defamation action . . . affords a remedy for damage to one's reputation." Dairy Stores, Inc. v. Sentinal Publ'g Co., Inc., 104 N.J. 125, 133 (1986). To establish a claim for defamation, a plaintiff must prove: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." G.D. v. Kenny, 411 N.J. Super. 176, 186 (App. Div. 2009) (internal quotation marks omitted).

23

Unlike defamation, the concept of trade libel, "also known as injurious falsehood, disparagement of property, or commercial disparagement" refers to "the tort addressing aspersions cast upon one's business operation." Patel v. Soriano, 369 N.J. Super. 192, 246 (App. Div. 2004).

To establish a cause of action for trade libel, a plaintiff must show: "(1) publication (2) with malice (3) of false allegations about the plaintiff's property or product (4) that cause special damages (pecuniary harm)." Dairy Stores, 104 N.J. at 161 (internal quotation marks omitted). The tort of trade libel requires "publication of a matter derogatory to the plaintiff's property or business" or "the quality of a plaintiff's business, or to his business in general[.]" Patel, 369 N.J. Super. at 246-48.

In Patel, we recognized:

> Distinguishing between personal defamation of a plaintiff and [trade libel] may be difficult. Generally, the latter tort has been applied to statements that are injurious to plaintiff's business, but cast no reflection on either plaintiff's person or property. For example, if the statement charges plaintiff with personal misconduct, or imputes to plaintiff reprehensible personal characteristics, it is regarded as libel or slander. If, however, the aspersion reflects only on the quality of plaintiff's product, or on the character of plaintiff's business as such, it is [trade libel].
>
> [Id. at 247 (internal citations omitted).]

24

To be sure, trade libel and defamation may "merge when a disparaging statement about a product reflects on the reputation of the business that made, distributed, or sold it." Dairy Stores, 104 N.J. at 133. For example, if "a statement about the poor quality of a product implies that the seller is fraudulent, then the statement may be actionable under both theories." Ibid.

Nevertheless, statements that imply a "plaintiff was personally dishonest, reprehensible, or lacking in integrity" fall under the tort of defamation as opposed to trade libel. Patel, 369 N.J. Super. at 249 (finding statements that "pertained solely to the character of the medical services provided by plaintiff[,]" rather than plaintiff personally, fell "under the tort of trade libel[] as opposed to personal defamation"). Indeed, "where the imputation fairly implied is that the plaintiff is dishonest or lacking in integrity, or that he is deliberately perpetrating a fraud upon the public by selling a product which he knows to be defective" only "personal defamation is usually found[.]" Id. at 248 (internal quotation marks omitted).

We are satisfied Milton's cause of action against CNBC sounds in personal defamation rather than trade libel. As alleged repeatedly in Milton's complaint, his cause of action against CNBC is for harm to his personal reputation, not harm to any specific business or product. He claims the Broadcast "portray[ed]

[him] as a devious, manipulative architect of a fraudulent enterprise" and targeted "Milton and Milton alone[.]"  He also claims the Broadcast included "false and misleading descriptions of [his] early ventures, portraying him as a charismatic yet deceptive entrepreneur" and "cast[] doubt on [his] integrity before the inception of Nikola."  The allegations include a claim that "Milton committed a crime by diverting accounts receivable from [one of his early businesses] to himself[.]"  Milton also alleges the Broadcast included an interview of a former acquaintance of his who claimed Milton advised him to sell his Nikola stock before the Report was published.

Milton contends the Broadcast caused "harm to [his] professional reputation" and his "professional relationships . . . suffered irreparable damage."  Specifically, "[m]ultiple clean-energy ventures [he] sought to develop post-Nikola were derailed" by "reputational concerns."  He was also "blocked from purchasing, among other things, the Badger program and the Powersports Division" from Nikola, and "[b]anks and brokerage firms terminated [his] accounts and/or refused his business[.]"  He claims the Broadcast "created a chilling effect on [his] ability to rehabilitate his career."  Finally, he "experienced a significant devaluation of his remaining stake in Nikola . . . in

26

the days and weeks following the [B]roadcast[,]" and it "caused severe harm to him personally, financially, and reputationally."

Because Milton's allegations are based on harm to his personal reputation, his claim sounds in defamation rather than trade libel. While it is true claims of defamation and trade libel can sometimes overlap and merge when the same disparaging statements cause harm to a person's personal reputation and the person's business or product, this is not such a case.

Here, the Broadcast did not include statements about Milton's businesses or products when it aired. Milton had not been an officer or employee of Nikola for over two years at the time the Broadcast aired, and he sold the other businesses mentioned in the Broadcast years before that time. To the extent the Broadcast disparaged Nikola, Nikola's products, or any of Milton's earlier business ventures, they were not Milton's businesses or products at the time of the Broadcast. If the Broadcast disparaged Nikola or its products in a manner constituting trade libel, that claim was Nikola's to assert, not Milton's.

We are not persuaded by Milton's claim that he can assert a trade libel claim based on harm to Nikola because his name is "tightly intertwined with"

27

and "inseparable from" Nikola.[6] When a claim for trade libel is asserted by an individual, as opposed to a separate business entity, there must be a sufficient nexus between the individual plaintiff and harm caused to that plaintiff's specific business or product. This occurs, for example, when the individual plaintiff is a professional whose personal reputation is inseparable from the plaintiff's business or product – the professional's trade – that was disparaged. See Patel, 369 N.J. Super. at 204 (trade libel claim asserted by a doctor for disparagement of his ability to practice medicine); Enriquez v. W. Jersey Health Sys., 342 N.J. Super. 501, 505 (App. Div. 2001) (same). That required nexus is not established where, as in this case, the alleged harm is based on the inability to engage in business and financial affairs generally as a result of harm to the plaintiff's personal reputation, not damages for harm to a specific business or product.

Milton's reliance on Schiavone Const. Co. v. Time, Inc., 619 F. Supp. 684 (D.N.J. 1985), is unavailing. In that case, the principal owner of the corporate plaintiff, Ronald A. Schiavone, asserted a defamation claim based on statements that referred to the corporation that bore his name. Id. at 687-92. The court

---

[6] In making this argument, Milton simultaneously concedes he "seeks recovery for [his] pecuniary losses . . . , not derivative corporate damages."

A-2791-24

denied the defendant's motion to dismiss finding a viable cause of action of defamation by Schiavone

> where the corporate entity is owned by a very few persons, of whom Schiavone is the principal one, where Schiavone is the Chairman of the Board of Directors, the Chief Executive Officer and the person who might well have been responsible for the major decisions of the corporation, and where the corporate entity bears Schiavone's name.

> [Id. at 697.]

That decision does not support Milton's claim that he should be permitted to assert a trade libel claim based on statements in the Broadcast about Nikola. Nikola is a publicly traded corporation, it does not bear Milton's name, and Milton was not an officer or employee of Nikola at the time of the Broadcast. Moreover, the claim in Schiavone was a personal defamation claim by an individual plaintiff based on statements about the corporation that bore his name, not a trade libel claim by an individual premised on alleged disparaging statements about a corporate entity.

Because Milton's cause of action against CNBC sounds in defamation and the alleged defamatory statements were made more than one year before the complaint was filed, his cause of action against CNBC is barred by the SOL. As a result, Milton's derivative aiding and abetting claim against Hindenburg fails

as a matter of law. Therefore, on remand the trial court is to enter an order dismissing plaintiff's complaint against all defendants with prejudice.

V.

CNBC and Hindenburg are entitled to an award of attorneys' fees and costs pursuant to UPEPA. The statute provides "the court shall award court costs, reasonable attorney's fees, and reasonable litigation expenses related to the [OTSC] . . . to the moving party if the moving party prevails on the [OTSC.]" N.J.S.A. 2A:53A-58.

We are unpersuaded by Milton's argument that UPEPA does not apply to his aiding and abetting claim against Hindenburg. In support of this argument, Milton contends UPEPA "does not apply to a cause of action asserted . . . against a person primarily engaged in the business of selling . . . goods or services <u>if the cause of action arises out of a communication related to the person's sale . . . of the good or services</u>." N.J.S.A. 2A:53A-50(c) (emphasis added).

Milton's cause of action against Hindenburg is based on the Broadcast by CNBC, not on any "communication related to [Hindenburg's] sale . . . of . . . good or services." Because UPEPA indisputably applies to CNBC's Broadcast, it also applies to the cause of action against Hindenburg for

A-2791-24

aiding and abetting the Broadcast. On remand, the court shall award reasonable attorneys' fees and costs to defendants in accordance with N.J.S.A. 2A:53A-58.

As a result of our determination that Milton's causes of action are barred by the SOL, we need not address defendants' other arguments. To the extent we have not specifically addressed any of Milton's remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed, vacated, and remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division